# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Luminara Worldwide, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co.,<br><br>          Defendants. | Case No. 14-cv-3103 (SRN/FLN)<br><br><br>**MEMORANDUM OPINION AND ORDER**<br><br>**[FILED UNDER SEAL]** |

Daniel R. Hall, Joseph W. Anthony, and Courtland C. Merrill, Anthony Ostlund Baer & Louwagie PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402; Ryan S. Dean, Fish & Tsang LLP, 2603 Main Street, Suite 1000, Irvine, CA 92614, for Plaintiff.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., The Light Garden, Inc., and Central Garden & Pet Co.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Michael J. Pape, Fish & Richardson PC, 60 South 6th

Street, Suite 3200, Minneapolis, MN 55402, for Defendant BJ's Wholesale Club, Inc.

Lukas Dustin Jonathon Toft and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendant Ambient Lighting, Inc.

SUSAN RICHARD NELSON, United States District Judge

## I.   INTRODUCTION

This matter is before the Court on (1) Defendants Liown Electronics Co. Ltd., Shenzhen Liown Electronics Co. Ltd., and Liown Technologies/Beauty Electronics, LLC's (collectively, "Liown" or the "Liown Defendants") Motion to Dismiss First Amended Complaint [Doc. No. 18]; (2) Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss First Amended Complaint [Doc No. 46]; (3) The Liown Defendants and Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 94]; (4) Defendant Tuesday Morning Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 111]; (5) Defendant Central Garden & Pet Co.'s Motion to Dismiss Second Amended Complaint [Doc. No. 113]; (6) Defendant Zulily, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 114]; (7) Defendant The Light Garden, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 116]; (8) Defendants BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 128]; and (9) Defendants' Motion to Dismiss Third Amended Complaint [Doc. No. 135].  For the reasons set forth below, the Court denies all nine motions.

## II.    BACKGROUND

### A. The Parties and Claims

Originally, two Plaintiffs, Candella, LLC (hereinafter, "Candella") and Luminara Worldwide, LLC (hereinafter, "pre-merger Luminara"), filed this patent infringement lawsuit against Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd. (hereinafter, "the Liown Defendants"). (See Compl. ¶ 12 [Doc. No. 1].) The Liown Defendants are all companies formed under the laws of the People's Republic of China, and have places of business in China. (See Third Am. Compl. ¶ 8 [Doc. No. 131].)

Until December 31, 2014, Candella was a California limited liability company that was the "exclusive licensee possessing all substantial right, title and interest to patents issued by the United States Patent and Trademark Office for inventions relating to flameless candles." (See id. ¶ 5.) Pre-merger Luminara was a Delaware limited liability company that "obtained from Candella the exclusive right to make, use and sell products utilizing Candella's licensed flameless candle technology." (See id. ¶ 6.) Candella owned 50% of pre-merger Luminara, and Candella's only revenues came from 60% of pre-merger Luminara's profits from selling the patented products at issue. (See Merrill Decl., Ex. 14 "Motion Hearing Transcript" at 11:5–6 [Doc. No. 37-4].)

On September 10, 2014, Plaintiffs filed a First Amended Complaint, which amended the list of Defendants and the list of patents-in-suit. (See generally First Am. Compl. [Doc. No. 13].) The newly added Defendants included Boston Warehouse Trading Corp. and Abbott of England (1981), Ltd. (See generally First Am. Compl.

3

[Doc. No. 13].)  Boston Warehouse Trading Corp. and Abbott of England (1981), Ltd. both import into the United States and sell throughout the United States flameless candles manufactured by Liown, which allegedly infringe Plaintiffs' patents.  (See id. ¶¶ 9, 10.)

Plaintiffs alleged three counts against Defendants.  In Count I, they stated a claim for patent infringement, alleging that Defendants "have been, and still are, directly infringing, either literally or under the doctrine of equivalents," claims of four patents: (1) United States Patent No. 7,837,355 ("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No. 8,696,166 ("the '166 patent").  (See id. ¶ 16 [Doc. No. 13].)

In Count II, Plaintiffs sought a declaratory judgment of non-infringement.  (See id. ¶¶ 21–34.)  Specifically, they sought a judgment from the Court that its candles do not infringe any valid claim of the Liown Defendants' U.S. Patent No. 8,789,986 ("the '986 patent").  (See id. ¶ 33.)  Plaintiffs claim that the '986 patent is based on the exact Artificial Flame Technology that Candella disclosed to the Liown Defendants in a non-disclosure agreement.  (See Pl.'s Mem. at 16 [Doc. No. 36].)  Because Liown threatened to enforce its '986 patent against Plaintiffs, and because Plaintiffs argue that the intellectual property underlying the '986 patent was stolen from them, Plaintiffs seek a declaratory judgment of non-infringement.  (See First Am. Compl. ¶ 33 [Doc. No. 13].)

In Count III, Plaintiffs sought a declaratory judgment of invalidity.  (See id. ¶¶ 35–39.)  Specifically, Plaintiffs argue that because the intellectual property underlying the '986 patent was stolen from them, the '986 patent is "invalid for failure to satisfy one or

more of the conditions of patentability set forth in Title 35 of the United States Code."

(See id. ¶ 37.)

### B.  Underlying Contracts

#### 1.  Disney-Candella Contract

Candella became the "exclusive licensee" for "Artificial Flame Technology" as a result of entering into an Intellectual Property License Agreement ("Agreement") with Disney Enterprises, Inc. (hereinafter, "Disney").  Candella and Disney first entered into the Agreement in 2008.  (See Poley Decl., Ex. E "2008 Candella-Disney Agreement" [Doc. No. 22-2].)  The parties renewed and updated their Agreement in 2012.  (See Poley Decl., Ex. H "2012 Candella-Disney Agreement" [Doc. No. 22-4].)

Disney and Candella have updated the 2012 Agreement through four separate amendments.  (See Poley Decl., Ex. I "First Amendment" [Doc. No. 22-4]; Merrill Decl., Ex. 1 "Second Amendment" [Doc. No. 37-1]; Ex. 3 "Third Amendment" [Doc. No. 37-1]; Ex. 2 "Fourth Amendment" [Doc. No. 37-1].)  Each amendment consecutively builds on the others.  Therefore, in order to interpret the Agreement accurately, the Court references the 2012 Agreement, and all four amendments, as needed.

When the parties first executed the 2012 Agreement, the licensed patents covered by the Agreement included the Disney Patents related to the Artificial Flame Technology, "including, but not limited to [the '455 patent], together with any and all corresponding patents."  (See Ex. H, "2012 Agreement" at 2 [Doc. No. 22-4].)  Therefore, any other patents that Disney had, which related to the Artificial Flame Technology, were automatically subject to this Agreement and its subsequent amendments.  As of

September 9, 2014, the date the Fourth Amendment was fully executed, Disney's

Artificial Flame Technology patents included (1) United States Patent No. 7,837,355

("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United

States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No.

8,696,166 ("the '166 patent").  (See Merrill Decl., Ex. 2 "Fourth Amendment" at 5 [Doc.

No. 37-1]; see also Third Am. Compl. ¶ 20 [Doc. No. 131].)  The parties refer to these

four patents as the "Schedule A Patents" or the "Disney Patents."

Pursuant to the 2012 Agreement and the four subsequent amendments, Candella

was assigned a bundle of rights, and Disney retained certain rights.  Below, the Court

separately outlines the rights of Candella and Disney.

### a.  Candella's Rights

Pursuant to the 2012 Agreement, Disney granted Candella the right to a

"worldwide . . . exclusive license, with the exception of Disney's reserved rights in

Section 2.2 . . . only to the limited extent necessary to make, have made, use, sell, offer

for sell, and import the [patents-in-suit]."  (See Poley Decl., Ex. H "2012 Disney-

Candella Agreement" § 2.1 [Doc. No. 22-4].)  Although the Agreement initially provided

that this exclusive license was non-assignable, non-sublicensable, and non-transferable,

the First Amendment to the Agreement omitted this limitation from the Agreement. (See

Poley Decl., Ex. I "First Amendment" §§ 2(b), (c) [Doc. No. 22-4].)

Now, Candella has the right to "grant sublicenses under the Schedule A Patents

provided that as to each sublicense, Candella provides [Disney] with at least thirty (30)

days prior written notice of an intention to grant the sublicense including the identity of

the sublicensee and a copy of the sublicense agreement to be executed, and provides [Disney] with a fully executed copy of the sublicense agreement . . . within thirty (30) days after its execution."  (See id. § 2(b).)  Candella also has the right to assign its rights "with the consent of [Disney]," but Disney cannot unreasonably withhold its consent. (See id. § 2(c).)  Candella must also provide Disney "with a fully executed copy of the assignment agreement . . . within thirty (30) days after its execution."  (See id.)

Additionally, Candella has the "sole and exclusive right to enforce the [patents-in-suit] against third parties, including the sole and exclusive right to sue . . . in its own name and without joining [Disney], for past, present or future infringement of the [patents-in-suit]…. Candella agrees to provide [Disney] with at least thirty (30) days prior written notice of an intention to sue a third party including the identity of the third party."  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].) Although Candella must provide Disney with prior written notice of its intent to sue, Candella does not need prior written approval from Disney in order to sue an alleged infringer.  (See Poley Decl., Ex. I, "First Amendment" § 13(d) (stating that section 13.2 of the 2012 Agreement, which mandated that Candella receive prior written approval from Disney in order to sue, no longer applies) [Doc. No. 22-4].)

If Candella successfully sues for patent infringement, Disney is entitled to <span style="color:red">REDACTED</span> █████ royalty on monies paid to Candella via settlement or judgment.  (See id. § 3(b).) Candella also agreed to keep Disney "fully informed of the progress of any litigation relating to Candella's enforcement" of the patents-in-suit; "to promptly provide [Disney] with copies of all substantive papers filed and orders issued in such litigation;" and to

7

provide Disney "with a reasonable opportunity to review and provide comments on any papers prior to being filed by Candella that relate to a challenge to the validity or enforceability of the [patents-in-suit]." (<u>See</u> Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)  Although the Agreement provides for Disney to remain apprised of the state of the litigation, Candella still has the "sole and exclusive right to sue" and has the "discretion to select legal counsel to represent itself and [must] pay all legal fees and costs of enforcement." (<u>See</u> <u>id.</u>)  Also, Disney agreed to be bound "by any judgment that may be rendered in any suit with respect to the validity, the enforceability, and infringement" of any of the Schedule A Patents. (<u>See</u> <u>id.</u>)

The Agreement is set to expire on April 30, 2020, but either party is permitted to terminate the Agreement if both parties agree to do so, or if either party "material[ly] breach[es]" a term of the contract. (<u>See</u> Poley Decl., Ex. H "2012 Disney-Candella Agreement" §§ 7.2.1, 7.2.2 [Doc. No. 22-4].)  Candella may also choose to renew its license for the remainder of the lives of the patents, plus six years. (<u>See</u> Merrill Decl., Ex. 1 "Second Amendment" § 2 (amending § 7.1 of the 2012 Disney-Candella Agreement) [Doc. No. 37-1].)

**b. Disney's Retained Rights**

Although Candella acquired several rights through the 2012 Agreement and subsequent amendments, Disney also retained certain rights.  For instance, Disney retained formal "ownership" of, or "title to," the patents-in-suit. (<u>See</u> Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 9.1 [Doc. No. 22-4].)  Disney also retained responsibility for maintenance of the patents-in-suit.  Specifically, it controlled and

remained responsible for "all costs and expenses related to the preparation, prosecution, maintenance and all other activities related to the patent applications and issued patents associated with the Licensed Intellectual Property (as applicable)." (See id. § 12.)

Pursuant to the Agreement, Disney also retained the right to receive royalty payments:

> equal to REDACTED of Licensee's Gross Revenue for all Licensed Products manufactured during the Term (the "**Royalty Payments**"). The Royalty Payments [were] reduced to REDACTED for all Licensee's cumulative Gross Revenue in excess of REDACTED and [were further] reduced to REDACTED for all Licensee's cumulative Gross Revenue in excess of REDACTED ."

(See id. § 5.1) (bold in original). Candella also was required to make additional REDACT royalty payments to Disney on any "'Sub-licensee's Gross Revenue' from any products made or sold by or for the sublicensee under the sublicensee granted by Candella." (See Poley Decl., Ex. I, "First Amendment" § 3(a) [Doc. No. 22-4].) Additionally, as noted above, Disney also had the right to receive REDACTED royalties on any monies paid to Candella to satisfy a settlement or judgment as a result of litigation Candella entered to enforce the patents-in-suit. (See id. § 3(b).)

Most importantly, Disney retained the nonexclusive right for itself, and its Affiliates, to "make, have made, use, sell, offer for sale and import the Licensed Products, within and outside the Product Categories" throughout the world. (See Poley Decl., Ex. H, "2012 Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].) The Agreement defined the term "Affiliate" to mean:

> any entity controlling or controlled by or in common control with a Party,

9

> where "control" is defined as the ownership of at least 50% of the equity or
> beneficial interest of such entity or the right to vote for or appoint a
> majority of the board of directors or other governing body of such entity.

(See id. § 1.)  Furthermore, for purposes of determining which entities retained the right

to make, use and sell the products at issue, "the term 'Affiliate' [did] not include an entity

operated under license from the Walt Disney company where such license [was] only a

license to Artificial Flame Technology."  (See id. § 2.2.)  In other words, Disney was not

permitted to license the Artificial Flame Technology to a company merely for the

purposes of licensing the patents.

### 2.  Candella-Luminara Contract

After acquiring the rights outlined above, Candella entered into an Exclusive

Sourcing and Distribution Agreement with pre-merger Luminara on October 6, 2010,

which was later replaced with an agreement dated March 31, 2011.  (See Pl.'s Mem. at 7

[Doc. No. 36].)  On February 3, 2014, Candella, the Principal, and pre-merger Luminara,

the Distributor, entered into an Amended and Restated Exclusive Sourcing and

Distribution Agreement (hereinafter, "the Sublicense"), which superseded and replaced

any prior agreement between the two parties.  (See generally Merrill Decl., Ex. 4

"Sublicense" [Doc. No. 37-1].)

### a.  Pre-Merger Luminara's Rights

The Sublicense provided that pre-merger Luminara "hereby accepts appointment,

as [Candella's] exclusive sourcing agent and exclusive distributor during the term of this

Agreement with the exclusive right to manufacture, have manufactured, sell, promote,

and otherwise distribute Products to Customers in the Territory."  (See id. § 2.01.)

Candella also granted to pre-merger Luminara the "right to exclude all others, from making, using, or selling any product that uses any Intellectual Property licensed by [Candella] under the Disney License or any Intellectual Property owned or otherwise held by [Candella]." (See id.) Specifically, the Sublicense provided that pre-merger Luminara "may institute any proceedings against . . . third party infringers and join [Candella] as a plaintiff in such action." (See id. § 11.03.) According to the Sublicense:

> [e]ach party agrees to cooperate fully with the other party in any action taken against such third parties, provided that all expenses of such action shall be borne by the party instigating the action and all damages which may be awarded or agreed upon in settlement of such action shall accrue first to the party taking the action in an amount sufficient to cover all costs and expenses of such action, and thereafter to [Candella.]

(See id.) Therefore, even if pre-merger Luminara had successfully brought suit against an infringer, Candella would have the rights to all damages, excluding the amount needed to cover pre-merger Luminara's costs and expenses of litigation. Moreover, the Court notes that pre-merger Luminara's right to exclude all others was shared with Candella. The Sublicense gave Candella *and* pre-merger Luminara both the right to sue for patent infringement. (See id. § 11.03.)

Additionally, the Sublicense prohibited either party from assigning or otherwise transferring its rights and obligations "except with the prior written consent of the other party." (See id. § 16.02.) Withholding of consent need not be reasonable. (See id.) Accordingly, Candella could have chosen to unreasonably withhold consent for pre-merger Luminara to transfer its rights, and vice-versa. (See id.)

Finally, the Sublicense provided that either party could terminate the Sublicense "in the event the other party [was] in material breach." (See id. § 12.02(a).) Either party could also terminate the Sublicense if the other party filed for bankruptcy or became insolvent. (See id. § 12.02(b).)

### b. Candella's Retained Rights

As for Candella's rights, the Sublicense explicitly stated that "[Candella] shall own all rights and licenses to Intellectual Property." (See id. §11.01.) Pre-merger Luminara "acknowledge[d] that under no circumstances [would] it acquire any ownership rights of any Intellectual Property owned by [Disney], which [was] licensed to [Candella] under the Disney License." (See id.)

Candella also agreed to, at its own expense, "defend [pre-merger Luminara] and its affiliates . . . against all claims that are based upon allegations (i) that the Artificial Flame Technology and any related Intellectual Property infringes any third party's intellectual property." (See id. § 9.02.) As part of this agreement, Candella promised to "indemnify" pre-merger Luminara "against any and all costs, losses, damages and expenses arising from or related to such claims." (See id.)

As noted above, Candella also retained its right to "institute any proceedings against such third party infringers and join [pre-merger Luminara] as a plaintiff in such action." (See id. § 11.03.) Although pre-merger Luminara also had the right to sue to enforce the patents, Candella kept all damages from successful litigation, excluding litigation costs and expenses. (See id.) The Sublicense also required pre-merger Luminara to pay "Distribution Payments" or royalties to Candella on its cumulative gross

revenue.  (See id. § 7.01.)

Finally, in addition to having the right to terminate the Sublicense in the event that pre-merger Luminara materially breached the contract, filed for bankruptcy, or became insolvent, Candella also had the right to terminate this Sublicense if the Disney License was terminated.  (See id. § 12.02(c).)

### 3. Plaintiffs' Relationship with the Liown Defendants

Plaintiffs explain in their response brief that, in "February 2010, Candella sought a factory capable of manufacturing its flameless candles."  (See Pl.'s Mem. at 9 [Doc. No. 36].)  "On February 16, 2010, Candella entered into a non-disclosure agreement ('NDA') with Liown to facilitate negotiations for Liown to manufacture Luminara's candle."  (See id.)  In the following weeks, Candella showed Liown a prototype candle, discussed the candle's design, and shared detailed design drawings with Liown as part of the negotiations process.  (See id.)

By June 2010, negotiations with Liown "broke down," and "Liown [allegedly] surreptitiously filed a patent application in China on June 28, 2010 claiming ownership of the Artificial Flame Technology that Candella had disclosed to Liown under the terms of the NDA."  (See id.)  Liown also filed for patent protection in the United States and was eventually issued the '986 patent.  (See id.)  Plaintiffs argue that the '986 patent claims "the same features Candella disclosed to Liown under the NDA in 2010."  (See id. at 10 (citing Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6]).)  In previous patent infringement litigation, Liown conceded that the earliest conception date for the invention underlying the '986 patent was February 25, 2010.  (See Merrill Decl., Ex. 21,

"Interrogatories and Answers" at 7 [Doc. No. 37-4].)

Liown allegedly began selling flameless candles in the United States in 2012. (See Pl.'s Mem. at 10 [Doc. No. 36].)  Candella filed a lawsuit against the Liown Defendants alleging patent infringement in November 2012.  (See id.)  Liown moved to dismiss the action on standing grounds.  (See id.)  Before the district court judge assigned to the case could issue a ruling, the parties entered into a settlement agreement in November 2013.  (See id. (citing Merrill Decl. ¶ 3 [Doc. No. 37]).)  Soon after, the '986 patent was issued on July 29, 2014.  (See Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6].)  A few days later, on August 5, 2014, Liown notified pre-merger Luminara by letter that it would no longer comply with the terms of the settlement because it felt it was "time to part ways."  (See Merrill Decl., Ex. 22 "Letter from Liown to David Baer" [Doc. No. 37-4].)  Plaintiff read this letter as Defendants threatening to sue Plaintiffs for infringing Liown's '986 patent.  (See Third Am. Compl. ¶ 33 ("In the [August 2012] letter, counsel for Liown . . . threatened enforcement of future patent rights.") [Doc. 131].)

The same day, Plaintiffs filed this suit.  (See generally Compl. [Doc. No. 1].)  The next day, on August 6, 2014, Liown filed its own Complaint in an action titled Shenzhen Liown Electronics Co., Ltd. v. Luminara Worldwide, LLC, et al., No. 14-cv-3112 (SRN/FLN).  The Liown Complaint includes two causes of action: a claim for infringement of the '986 patent against all defendants, and a claim against the Luminara Defendants for tortious interference with existing and prospective business relationships. See Shenzhen Liown Elecs. Co., Ltd. v. Luminara Worldwide, LLC, et al., No. 14-cv-

14

3112, Second Am. Compl. [Doc. No. 60].

**C. Procedural Posture**

On September 24, 2014, the Liown Defendants filed a Motion to Dismiss Plaintiffs'
First Amended Complaint [Doc. No. 18].  Liown argued that the Court lacked subject
matter jurisdiction because Candella and Luminara lacked standing to sue for patent
infringement, and because Plaintiffs' claims for declaratory judgment relating to Liown's
patent were anticipatory.  (See Liown's Mot. to Dismiss at 1 [Doc. No. 18].)

On November 7, 2014, Defendants Abbott of England (1981), Ltd. ("Abbott") and
Boston Warehouse Trading Corp. ("Boston Warehouse") also filed a Motion to Dismiss
Plaintiffs' First Amended Complaint [Doc No. 46].  Abbott and Boston Warehouse joined
Liown's Motion to Dismiss and based their motion of the Liown Defendants' briefs,
declaration, and exhibits.  (See Boston Warehouse and Abbott's Mot. to Dismiss at 1 [Doc.
No. 46].)

On January 14, 2015, Magistrate Judge Franklin L. Noel granted Plaintiffs'
Motion for Leave to File a Second Amended Complaint [Doc. No. 65].  (See MJ's Order
[Doc. No. 87].)   On the same day, Plaintiffs filed a Second Amended Complaint, in
which Plaintiffs named several additional Defendants and alleged five new counts.  (See
generally Second Am. Compl. [Doc. No. 88].)  The newly named Defendants included:
BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday
Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden &
Pet Co.  (See id.)  Like Boston Warehouse and Abbott, all of the newly added Defendants
also allegedly sold flameless candles that were manufactured by Liown, in violation of

15

Plaintiffs' patents.  (See id. ¶¶ 11–18.)

Plaintiffs' new claims included: Count IV, in which Plaintiffs allege that Defendant Central Garden & Pet Co., doing business through its Bethlehem Lights division GKI/Bethlehem Lighting, breached its contract with pre-merger Luminara; Count V, in which Plaintiffs allege that the Liown Defendants and Boston Warehouse tortiously interfered with a contract; Count VI, in which Plaintiffs allege that the Liown Defendants breached a non-disclosure contract; Count VII, in which Plaintiffs allege that the Liown Defendants misappropriated trade secrets; and Count VIII, in which Plaintiffs allege that the Liown Defendants, Boston Warehouse, and Tuesday Morning are liable for trademark infringement/unfair competition.  (See id. ¶¶ 50–112.)  Plaintiffs also clarified in their Second Amended Complaint that Count I, the patent infringement claim, was alleged against all Defendants, while the declaratory judgments sought in Count II and Count III were only alleged against the Liown Defendants.  (See id. ¶¶ 24–49.)

On February 11, 2015, the Liown Defendants, Abbott, and Boston Warehouse jointly filed a Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. No. 94], based on the Liown Defendants' briefs [Doc. Nos. 20, 45], declaration and exhibits [Doc. No. 22] that were initially filed in support of Liown's first Motion to Dismiss.  Relying on the same underlying briefs and exhibits, Defendants Tuesday Morning Corp., Central Garden & Pet Co., Zulily, Inc., The Light Garden, Inc.,  BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc. all filed Motions to Dismiss Plaintiffs' Second Amended Complaint [Doc. Nos. 111, 113, 114, 116, 128].

On January 12, 2015, Plaintiffs filed a letter informing the Court that "Candella

16

and Luminara have merged effective December 31, 2014." (See Merrill Letter at 1 [Doc.

No. 83].) The companies merged and left "Luminara Worldwide, LLC as the surviving

entity" that exists under the laws of the State of Delaware. (See id.) As a result of the

merger, Candella was eliminated as a named Plaintiff in this case and post-merger

Luminara was left as the sole Plaintiff.

Consequently, the Court ordered the parties to submit briefing to address the

effect, if any, the merger had on the pending motions before the Court. (See 1/14/15

Order [Doc. No. 85].) Plaintiff filed supplemental briefing arguing that since "[a]t the

outset of this case both Candella and [pre-merger] Luminara had standing," the merger

"does not affect [post-merger] Luminara's standing." (See Pl.'s Supp. Brief at 2 [Doc.

No. 97].) Defendants similarly argued in their supplemental brief that the merger did not

affect their Motion to Dismiss because just as Candella and Luminara separately lacked

standing, post-merger Luminara also lacks standing. (See Liown's Supp. Brief at 1 [Doc.

No. 112].)

Finally, on March 2, 2015, Plaintiff Luminara filed a Third Amended Complaint

that reflected the merger of Candella and pre-merger Luminara in the caption of the case

and within the Complaint itself. (See Third Am. Compl. ¶ 7 [Doc. No. 131].) Plaintiff

specifically alleged that as a result of the merger, "Luminara is the exclusive licensee

possessing all substantial right, title and interest to those patents to which Candella

previously held exclusive rights." (See id.) In all other respects, however, the Third

Amended Complaint was consistent with the facts and claims alleged in the Second

Amended Complaint. (See generally id.) Defendants then collectively filed a single

17

Motion to Dismiss Third Amended Complaint [Doc. No. 135], and based the motion on

the Liown Defendants' briefing, declaration, and exhibits [Doc. Nos. 20, 22, 45].  All of

these Defendants simply "join" Liown's Motions to Dismiss.  Because all of the pending

motions rely on the Liown Defendants' initial briefs [Doc. Nos. 20, 45], declaration, and

exhibits [Doc. No. 22], the Court's discussion below engages with the arguments raised in

those materials.

### III.    DISCUSSION

#### A.  Standard of Review

Defendants move to dismiss the First, Second, and Third Amended Complaints,

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, because Plaintiff

allegedly lacks standing.  Rule 12(b)(1) of the Federal Rules of Civil Procedure provides

that a party may move to dismiss a complaint for lack of subject matter jurisdiction.  See

Fed. R. Civ. P. 12(b)(1).  When considering a Rule 12(b)(1) motion, a district court may

consider matters outside the pleadings.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947);

Satz v.. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980). "[N]o presumptive

truthfulness attaches to the plaintiff's allegations, and the existence of disputed material

facts will not preclude the trial court from evaluating for itself the merits of jurisdictional

claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact

exist."  Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990).  Accordingly, in this

case, Plaintiff must prove that it has standing.

"A court may exercise jurisdiction only if a plaintiff has standing to sue on the

date it files suit."  See Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364

(Fed. Cir. 2010); see also Graffiti Entm't, Inc. v. Speed Commerce Inc., No. 14-cv-752 (ADM/FLN), 2014 WL 5795477, at *3 (D. Minn. Nov. 6, 2014).  Therefore, if either (1) Candella, or (2) pre-merger Luminara had standing on the date the lawsuit was filed, then post-merger Luminara also has standing, as it has subsumed the rights of both Candella and pre-merger Luminara.  See ISI Int'l v. Borden Ladner Gervais, LLP, No. 98 C 7614, 2002 WL 230904, at *1 (N.D. Ill. Feb. 15, 2002) aff'd sub nom. ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 316 F.3d 731 (7th Cir. 2003) (stating that "[a] transfer of interest includes a corporate acquisition where the original party no longer exists and a new entity has unreservedly assumed its rights and obligations.") (citing Moore's Federal Practice 3d, § 25.30).

### B.  Candella Received "All Substantial Rights" From Disney

Defendants contend that Candella and pre-merger Luminara lack standing. (See Liown's Mem. at 1 [Doc. No. 20].)  Defendants argue that "[t]he single most important factor in the determination of who has standing to sue as the effective owner of a patent is whether the owner retained any rights to practice the patent."  (See id. at 18.)  Defendants further argue that, here, Disney reserved for itself and its Affiliates the right to practice the patent by reserving the "right throughout the world to make, have made, use, sell, offer for sale and import" products covered by the Disney Patents without limitation. (See Poley Decl., Ex. H § 2.2 [Doc. No. 22-4].)  Defendants explain that Disney's retained rights are "simply incompatible with a transfer of all substantial rights under the Disney Patents to Candella."  (See Liown's Mem. at 19 [Doc. No. 20].)  The Court disagrees.  Below, the Court explains the standard for determining whether a party

19

obtained all substantial rights, and applies that standard to the facts of this case to find

that Candella, in fact, obtained all substantial rights to the Disney Patents.

### 1. Standard for Determining Transfer of "All Substantial Rights"

As the Court noted above, post-merger Luminara has standing only if either

Candella or pre-merger Luminara had standing to sue for patent infringement on the date

that the Complaint was filed.  The Patent Act provides that "[a] patentee" is entitled to

bring a civil action "for infringement of his patent."  35 U.S.C. § 281 (2012).  The term

"patentee" includes "not only the patentee to whom the patent was issued but also the

successors in title to the patentee."  Id. § 100(d).  The United States Court of Appeals for

the Federal Circuit has interpreted those provisions of the Patent Act as requiring a party

bringing suit for patent infringement to have legal title to the patent.[1]  See Propat Intern.

Corp. v. Rpost, Inc., 473 F.3d 1187, 1189 (Fed. Cir. 2007); Sicom Sys. Ltd. v. Agilent

Techs., Inc., 427 F.3d 971, 976 (Fed. Cir. 2005); Rite-Hite Corp. v. Kelley Co., 56 F.3d

1538, 1551 (Fed. Cir. 1995) (en banc); Abbott Labs. v. Diamedix Corp., 47 F.3d 1128,

1130 (Fed. Cir. 1995).

"Even if the patentee does not transfer formal legal title, the patentee may effect a

transfer of ownership for standing purposes if it conveys all substantial rights in the

---

[1]     Although procedural aspects of patent cases are typically controlled by the law of
the circuit in which the case is filed, if the "issue [is] unique to patent law," then Federal
Circuit case law controls.  See Madey v. Duke Univ., 307 F.3d 1351, 1358 (Fed. Cir.
2002) (explaining that "[o]n procedural issues, this Court follows the rule of the regional
circuit, unless the issue is unique to patent law and therefore exclusively assigned to the
Federal Circuit.").  As the issue of standing under the Patent Act is an issue unique to
patent law, Federal Circuit precedent controls in this case.  See Toshiba Corp. v. Wistron
Corp., 270 F.R.D. 538, 540–41 (C.D. Cal. 2010).

patent to the transferee." See Propat, 473 F.3d at 1189 (citing Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000); Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991)).  One of those substantial rights must include an "exclusive license" to practice the patent at issue.  See Propat, 473 F.3d at 1193.  In the event that a transferee obtains an exclusive license *and* all substantial rights, "the transferee is treated as the patentee and has standing to sue in its own name." See id. at 1189.  "Such a licensee is in effect an 'assignee' and therefore a patentee." Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1484 (Fed. Cir. 1998).  "When this happens," the de facto assignee, or exclusive licensee, "has sole standing to sue those suspected of infringing the patents' claims."  Alfred E. Mann Found. For Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1359 (Fed. Cir. 2010); see Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1343 (Fed. Cir. 2006) (explaining that a patent may not have multiple separate owners for purposes of determining standing to sue).  The Federal Circuit explains that one of two possibilities exists:

> Either the licensor did not transfer "all substantial rights" to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer "all substantial rights" to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own.

Mann, 604 F.3d at 1359–60.

In patent infringement suits, a plaintiff must satisfy the requirements for both: (1) constitutional standing; and (2) prudential standing.  See Morrow v. Microsoft Corp., 499 F.3d 1332, 1338–40 (Fed. Cir. 2007).  Constitutional standing derives from a plaintiff's

proprietary, and exclusionary, interest in a patent because through this interest the party

may suffer a cognizable injury under <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560

(1992).  In contrast, prudential standing concerns which parties must participate in

litigation.  <u>See</u> <u>Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.</u>, 248 F.3d

1333, 1348 (Fed. Cir. 2001).

In <u>Morrow</u>, the Federal Circuit explained that if a plaintiff suing for patent

infringement has an exclusive license *and* "all substantial rights," then it has both (1)

constitutional standing because it suffers injury-in-fact; and (2) prudential standing

because it has "all substantial rights."  <u>See</u> 499 F.3d 1332, 1340 (Fed. Cir. 2007).

However, if the Court finds that the plaintiff holds only some exclusionary rights

and interests, but not all substantial rights to the patent, then the party is deemed to have

constitutional standing but not prudential standing.  <u>See</u> <u>id.</u>  Accordingly, in these

instances, the patentee who transferred the exclusionary interests must usually be joined

to satisfy prudential standing concerns.  <u>See</u> <u>id.</u> (citing <u>Indep. Wireless Tel. Co. v. Radio</u>

<u>Corp. of Am.</u>, 269 U.S. 459, 467, 469 (1926)); <u>Propat</u>, 473 F.3d at 1193; <u>Waterman v.</u>

<u>Mackenzie</u>, 138 U.S. 252, 255 (1891).  "The patentee is joined for the purpose of

avoiding the potential for multiple litigations and multiple liabilities and recoveries

against the same alleged infringer."  <u>See</u> <u>Morrow</u>, 499 F.3d at 1340 (citing <u>Intellectual</u>

<u>Prop. Dev., Inc.</u>, 248 F.3d at 1347 (indicating that joining the patentee satisfies a

prudential not constitutional standing requirement); <u>Propat</u>, 473 F.3d at 1193; <u>Indep.</u>

<u>Wireless</u>, 269 U.S. at 469 (stating that when a contract provides no express covenant by

the patent owner to sue infringers, the contract necessarily includes an implied obligation

22

to allow use of the licensor's name, because that right is indispensable to the enjoyment of the patent monopoly)).

In contrast, nonexclusive licensees, or bare licensees, lack standing to sue for patent infringement and cannot cure their lack of standing by joining the patent owner as a plaintiff.  See Propat, 473 F.3d at 1193–94; Fieldturf, Inc. v. Sw. Recreational Indus., Inc., 357 F.3d 1266, 1269 (Fed. Cir. 2004) (explaining that because the transferee was not granted the right to enforce the patent, the agreement conveyed no more than a bare license).

The Court's inquiry, therefore, begins with determining whether the agreement between the parties constitutes a transfer of all substantial rights.  To complete this inquiry, the Court "'must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted.'"  See Mann, 604 F.3d at 1359 (quoting Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001)); see also Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1011 (Fed. Cir. 1967).

### 2.  "All Substantial Rights" Factors

The Court determines whether the original patent owner conveyed all substantial rights based on the "totality" of the rights transferred.  See AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1321 (Fed. Cir. 2009) (explaining that "[w]hile any [individual] . . . restriction[] alone might not have been destructive of the transfer of all substantial rights, their totality is sufficient to do so").

The Federal Circuit has "never purported to establish a complete list of the rights

whose holders must be examined to determine whether a licensor has transferred away

sufficient rights to render an exclusive licensee the owner of a patent." Mann, 604 F.3d

at 1360.  Nonetheless, the Federal Circuit has compiled a non-exhaustive list of rights for

determining whether a licensor has transferred "all substantial rights" to the licensee.

The list includes the following factors:

> (1) the nature and scope of the right to bring suit; (2) the exclusive right to
> make, use, and sell products or services under the patent; (3) the scope of
> the licensee's right to sublicense; (4) the reversionary rights to the licensor
> following termination or expiration of the license; (5) the right of the
> licensor to receive a portion of the proceeds from litigating or licensing the
> patent; (6) the duration of the license rights; (7) the ability of the licensor to
> supervise and control the licensee's activities; (8) the obligation of the
> licensor to continue paying maintenance fees; and (9) any limits on the
> licensee's right to assign its interests in the patent.

Azure Networks, LLC v. CSR PLC, 771 F.3d 1336, 1343 (Fed. Cir. 2014), petition for

cert. filed, _ U.S.L.W. _ (U.S. Feb. 12, 2015) (No. 14-976) (citing Mann, 604 F.3d at

1360–61.)

Generally, transfer of several of these rights is necessary in order for a court to

determine that "all substantial rights" were transferred.  See Mann, 604 F.3d at 1360–61

(finding that transferring the exclusive right to make, sell, or use products under the

patents is vitally important, transferring the right to enforce the patents is frequently most

important, and acknowledging the importance of transferring the right to recover

licensing royalties, control over activities, limits on the duration of the rights, and limits

on assigning the patents); accord AsymmetRx, Inc., 582 F.3d at 1321 (requiring joinder

of licensor where contract allowed licensor to retain right to make and use invention for

limited purposes, required licensee to consider public interest in granting sublicenses,

imposed restrictions on licensee's sale of invention, and permitted licensor to retain a share of royalties from sublicenses); Abbott Labs., 47 F.3d at 1132–33 (requiring joinder of co-owner because the co-owner retained a limited right to make, use or sell the invention, to bring suit if the licensee refused, and to limit assignment to only successors in business); Propat, 473 F.3d at 1190–91 (requiring joinder of co-owner because co-owner retained implicit right to use invention, right to proceeds from litigation and licensing, ability to reasonably veto licensing and litigation decisions, and to limit assignment of rights).

### 3.   Candella Received "All Substantial Rights"

The Agreement provided that Candella had: (1) a proprietary interest in the patent because it had an exclusive license to make, use and sell the products; (2) the sole and exclusive right to enforce the patents-in-suit; (3) the right to sublicense; and (4) the right to assign.   Based on a totality of the rights transferred, the Court finds that Candella received "all substantial rights" from Disney.   The Court discusses each of these factors below.

### a.   Proprietary Interest: Exclusive License to Make, Use, and Sell

For a plaintiff to have standing, "a licensee must have beneficial ownership of some of the patentee's proprietary rights."   Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1034 (Fed. Cir. 1995).   Here, the 2012 Agreement provides that Candella had such a proprietary right.   According to the 2012 Agreement, Candella had the right to a "worldwide . . . exclusive license . . . to make, have made, use, sell, offer for sell, and

import the [patents-in-suit]." (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 2.1 [Doc. No. 22-4].)

In Vaupel, the Federal Circuit explained that "[i]t is well settled that '[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions.'" See 944 F.2d at 875 (holding that exclusive licensee had all substantial rights because it had the exclusive right to make, use, and sell; the right to sue as long as the patentee was informed of the suit; and the right to sublicense with written consent from the patentee) (citing Waterman, 138 U.S. at 256.) Therefore, although the Agreement characterizes Candella's right to make, use, and sell the products, as an "exclusive license," the term "exclusive license" is not by itself dispositive of whether Candella's right was in fact "exclusive."

Defendants argue that Candella lacks standing because its rights are not exclusive, as Disney maintained the right to practice its patents.[2] (See Liown's Mem. at 23 [Doc. No. 20].) The Court disagrees. The Federal Circuit recently explained that a licensee may have an "exclusive license," even though others, like the patent owner, may retain a license to practice the patent as well. See WiAV Solutions LLC v. Motorola, Inc., 631 F.3d 1257, 1266 (Fed. Cir. 2010). In WiAV, the Federal Circuit stated that in order "for a licensee to be an exclusive licensee of a patent," the licensee need not be "the *only* party with the ability to license the patent." See id. (emphasis original); see also Mann, 604 F.3d 1354 (Fed. Cir. 2010) (concluding that a licensee was an exclusive licensee of a

---

[2]    The Court addresses Defendants' argument in more detail in Part III(B)(4)(a).

patent despite the licensor retaining the ability to license the patent to settle lawsuits).

The Federal Circuit explained that there is no "indication that the court [in Textile

Productions, 134 F.3d 1481, 1484 (Fed. Cir. 1998),] created a bright-line rule that a party

cannot be an exclusive licensee of a patent if others have the right to license the patent."

See WiAV, 631 F.3d at 1266.  Rather, the WiAV Court explained that the validity of a

licensee's exclusionary right rests on the licensee's right to exclude a particular

defendant, as opposed to the right to exclude all others.  See id. at 1267.  Therefore,

Federal Circuit precedent suggests that the term "exclusive" must not necessarily imply

"sole" or "only."

Here, while Disney retained the nonexclusive right to make, use, and sell the

products, it affirmatively granted Candella the sole "exclusive license" to make, use, and

sell the products.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 2.1

[Doc. No. 22-4].)  As WiAV demonstrates, it is not inconsistent for a licensee to have an

"exclusive license," while the patentee concurrently retains a nonexclusive license.

Therefore, Candella clearly has beneficial ownership of some of the proprietary rights of

the patents-in-suit.  See Morrow, 499 F.3d at 1339 (citing Lujan, 504 U.S. at 560–61).

In addition to having beneficial ownership of proprietary rights of the patents-in-

suit, Candella also allegedly suffers injury-in-fact.  See id. (citing Lujan, 504 U.S. at 560–

61).  Because Candella's only revenues were 60% of pre-merger Luminara's profits from

selling the candles, pre-merger Luminara, and therefore Candella, was injured when

customers purchased allegedly infringing candles from Defendants, as opposed to

purchasing similar candles from pre-merger Luminara/Candella.  (See Pl.'s Mem. at 19

[Doc. No. 36].)  Therefore, the Court finds that Candella has constitutional standing as an "exclusive licensee," because it has beneficial ownership in the patents and suffers an injury-in-fact.

### b.  Sole and Exclusive Right to Enforce the Patents-in-Suit

While Candella had constitutional standing as an exclusive licensee, in order to determine whether Candella obtained all substantial rights from Disney, and thus had prudential standing to bring suit without joining Disney as a co-plaintiff, the Court must analyze the other rights that Candella obtained through the Agreement.  According to the Agreement, Candella was given the "sole and exclusive right to enforce the [patents-in-suit] against third parties, including the sole and exclusive right to sue . . . in its own name and without joining [Disney], for past, present or future infringement of the [patents-in-suit]."  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)

The Federal Circuit has explained that "the right to sue for infringement . . . is particularly dispositive" when determining whether a patentee transferred all substantial rights to a licensee.  See Vaupel, 944 F.2d at 875–76.  In Vaupel, the licensee was granted the "exclusive right to make, use, and sell" the product and "the right to sue rested solely with [the licensee]."  Id. at 875–76.  The patentee only retained the right to be informed of the course of litigation on the patent.  See id. at 874.  Thus, the Federal Circuit held that the licensing agreement transferred all substantial rights to the licensee. Id. at 875–76.  The Vaupel Court explained that the licensee had constitutional standing because it was an exclusive licensee.  See id.  As for the court's prudential standing

28

analysis, it held that the licensee's sole right to sue was particularly dispositive for finding that the licensee had prudential standing because there was no concern that a single infringer could be sued twice on the same patent.  See id.  Similarly, in Speedplay, the Federal Circuit held that the exclusive licensee had all substantial rights because the licensee had complete effective control over litigation and assignment decisions.  See 211 F.3d at 1251–52.

Defendants contend that "[a]lthough the Federal Circuit often emphasizes the importance of the right to sue . . . the patent owner's retention of the right to practice the invention appears to be more dispositive."  (See Liown's Mem. at 21 [Doc. No. 20].) The Court disagrees.  Most recently, in Mann, the Federal Circuit reiterated that "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration," when determining whether all substantial rights were transferred.  Mann, 604 F.3d at 1361 (citing AsymmetRx, Inc., 582 F.3d at 1320–21; Sicom Sys. Ltd., 427 F.3d at 979–80; Abbott Labs., 47 F.3d at 1132).  The Mann Court explained that "[w]here the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee." Mann, 604 F.3d at 1361.  The court clarified, however, that if a licensor retains the right to sue infringers, this right does not preclude a finding that all substantial rights were transferred "if the licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers."  Id.  (citing Speedplay, 211 F.3d at 1251).

Here, Disney relinquished any and all right to sue to Candella.  In return, Disney contracted for the right to receive prior written notice of Candella's intent to sue.  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1]; see Poley Decl., Ex. I, "First Amendment" § 13.3 (stating that section 13.2 of the 2012 Agreement, which mandated that Candella receive prior written approval from Disney in order to sue, no longer applies) [Doc. No. 22-4].)  Disney also contracted for the right to remain "fully informed of the progress of any litigation relating to Candella's enforcement" of the patents-in-suit.  (See Merrill Decl., Ex. 2, "Fourth Amendment" § 2(a) [Doc. No. 37-1].)  As part of Disney's right to remain fully informed about the litigation, Candella must provide Disney "with copies of all substantive papers filed and orders issued," and must provide Disney "with a reasonable opportunity to review and provide comments on any papers" before Candella files those papers.  (See id.)

Although the Agreement provides for Disney to remain apprised of the state of the litigation, Candella still has the "sole and exclusive right to sue" and has the "discretion to select legal counsel to represent itself and [must] pay all legal fees and costs of enforcement."  (See id.)  In fact, Disney agreed to be bound "by any judgment that may be rendered in any suit with respect to the validity, the enforceability, and infringement" of any of the patents-in-suit.  (See id.)  Therefore, the Agreement sufficiently transferred the sole, exclusive, and unfettered right to enforce the patents to Candella.  For these reasons, the Agreement between the parties is similar to the agreements between the parties in Vaupel and Speedplay.  Like the patentee in Vaupel, Disney only retained the right to be informed about any litigation.  See 944 F.2d at 874.  And like the exclusive

30

licensee in <u>Speedplay</u>, Candella obtained complete effective control over any litigation. <u>See</u> 211 F.3d at 1250.

In contrast, this case is distinguishable from <u>Mann</u> and <u>Propat</u>, two cases in which the Federal Circuit held that all substantial rights were not transferred to the licensee.  In <u>Mann</u>, the Federal Circuit held that the licensor retained all substantial rights because it retained the secondary right to sue, following the licensee's right of first refusal.  <u>See</u> <u>Mann</u>, 604 F.3d at 1361–62.  If the licensor exercised its right to sue, it had the "final say regarding all decisions, including decisions about whether and how to settle the litigation."  <u>See</u> <u>id.</u>  at 1361.  Similarly, in <u>Propat</u>, the Federal Circuit held that the original holder of the patent did not convey all substantial rights because, among other things, it retained the right to veto litigation decisions, as long as that veto power was exercised reasonably.  <u>See</u> <u>Propat</u>, 473 F.3d at 1191.  The court held that because the licensee was obligated to obtain the original holder's consent for all litigation decisions, the original holder "retain[ed] substantial ongoing control of the sort [of decisions] typically associated with the retention of an ownership interest in the patent."  <u>See</u> <u>id.</u>

Here, Disney relinquished any right to sue on its own or veto Candella's litigation decisions.  Rather, it merely retained the right to remain informed about Candella's litigation efforts.  Accordingly, Candella's right to sue is unfettered by Disney.[3]  As the

---

[3]    Although the right to sue is often the most important consideration for determining whether all substantial rights have been transferred, "a right to sue clause cannot negate the requirement that [in order to have standing] . . . a licensee must have beneficial ownership of some of the patentee's proprietary rights.  A patentee may not give a right to sue to a party who has no proprietary interest in the patent."  <u>Ortho</u>, 52 F.3d at 1034; <u>Propat</u>, 473 F.3d at 1192 (stating that "[i]t has long been held that a 'right to sue' clause

Federal Circuit recognizes the sole right to enforce the patents as "the most important

consideration" for determining whether all substantial rights were conveyed, this factor

weighs heavily in favor of the Court's determination that Candella obtained all

substantial rights.  See Mann, 604 F.3d at 1361.

### c.  Right to Sublicense

Although the Court could reasonably end its "all substantial rights" analysis at this

point because it determined that Candella obtained the sole and exclusive right to sue, the

Court's finding that Candella obtained all substantial rights is bolstered by the fact that

---

in a contract, unaccompanied by the transfer of other incidents of ownership, does not
constitute an assignment of the patent rights that entitles the transferee to sue in its own
name.").

 This principle reflects the requirement that in order for a plaintiff to have standing
to sue, it must have constitutional standing, or an injury-in-fact.  See also Morrow v.
Microsoft Corp., 499 F.3d 1332, 1342 (Fed. Cir. 2007) (holding that while the plaintiff
obtained the right to sue, it did not obtain exclusionary, or proprietary, rights in the
patent, and therefore, the plaintiff lacked constitutional standing to sue for patent
infringement).  Without having beneficial ownership of some of the proprietary rights in
the patent, a plaintiff necessarily does not experience an injury-in-fact, and lacks
constitutional standing.  See id. at 1339 (citing Lujan v. Defenders of Wildlife, 504 U.S.
555, 560–61 (1992)).

 The Federal Circuit explained that this "principle sensibly reflects that a patent
owner may give another responsibility to select targets for suit – a power of attorney, in
effect – without surrendering ownership of the patent."  Propat, 473 F.3d at 1192
(holding that while the right to sue and grant licenses accords the plaintiff broad authority
to act as the patentee's agent for purposes of licensing and litigation, the plaintiff lacked
standing because it did not have any proprietary interest in the patent); see Penril
Datacomm Networks, Inc. v. Rockwell Int'l Corp., 934 F. Supp. 708, 711 (D. Md. 1996)
(holding that the plaintiff lacked standing it did "not dispute that it ha[d] nonexclusive
rights to the patent," and therefore lacked a proprietary interest in the patent for purposes
of standing).

 As the Court held above, the Agreement between Disney and Candella sufficiently
conveys a proprietary interest in the patents to Candella.  Therefore, the right to sue
clause was not unaccompanied by the transfer of other incidents of ownership.  See
Propat, 473 F.3d at 1192; Ortho, 52 F.3d at 1034.

the Agreement also permitted Candella the right to "grant sublicenses under [all four patents-in-suit]," as long as it gave Disney thirty days prior written notice.  (See Poley Decl., Ex. I "First Amendment" § 2(b) [Doc. No. 22-4].)  In Morrow v. Microsoft Corp., the Federal Circuit held that the plaintiff-liquidating trust lacked standing because, among other reasons, its lacked the right to sublicense.  See 499 F.3d 1332, 1342 (Fed. Cir. 2007).  The Morrow Court explained that "the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded."  See id. (citing Textile Prods., Inc., 134 F.3d at 1485; Prima Tek II, LLC v. A-Roo Co., 222 F.3d 1372, 1379 (Fed. Cir. 2000)).  In other words, according to the court, the right to sublicense is considered part and parcel of a party's exclusionary rights because the party could choose to grant a sublicense to an infringer, as opposed to suing that infringer.  See Morrow, 499 F.3d at 1342.  Because the licensee in Morrow lacked the right to indulge infringers by granting sublicenses, the licensee lacked the full right to exclude.  See id. at 1343.

The Federal Circuit has held that even if a licensee obtains the right to sublicense, if that right is not unfettered, the licensee likely has not obtained all substantial rights.  For instance, in Propat, although the licensee had the right to sublicense, the court held that all substantial rights were not transferred because the sublicensing right was subject to the licensor's veto power, which had to be exercised reasonably.  See 473 F.3d at 1191.  The Propat Court explained that the licensee's obligation to obtain consent for licensing decisions was inconsistent with a transfer of all substantial rights.  See id. (citing Sicom Sys., 427 F.3d 971, 979 (Fed. Cir. 2005); Intellectual Prop. Dev., 248 F.3d

33

at 1345).

Here, in stark contrast to the Morrow plaintiff that completely lacked the right to sublicense, Candella obtained the unfettered right to grant sublicenses. See Morrow, 473 F.3d at 1342–43. Candella's right to sublicense is also significantly greater than the licensee's right in Propat because Candella's right is not subject to Disney's veto. Cf. Propat, 473 F.3d at 1191. Although Candella must provide Disney with prior written notice of its intent to sublicense, its obligation is simply to inform Disney as to how it will exercise its right. Disney's consent to sublicense is not required.

### d. Right to Assign

Finally, the bundle of rights Candella received from its Agreement with Disney included the right to assign. (See Poley Decl., Ex. I "First Amendment" § 2(c) [Doc. No. 22-4].) Although Disney was required to consent to Candella's assignment, Disney was prohibited from unreasonably withholding its consent. (See id.) Similar to the weight given to the right to sublicense, the Federal Circuit has explained that the right to assign is also an important right that must be considered when determining whether a licensee obtained all substantial rights. See Azure Networks, LLC, 771 F.3d at 1343. In Sicom Systems, the Federal Circuit explained that the licensee lacked standing because, among other reasons, the original patent owner retained "the right to veto [the licensee's] reassignment of its rights." See Sicom Sys., Ltd., 427 F.3d at 978. The court found that the restriction on the licensee's right to assign was a "fatal reservation of rights by [the patent owner]." See id. at 979.

In contrast, in Speedplay, the Federal Circuit held that although the plaintiff-

licensee could not assign its interest in the license without the consent of the patent

holders, the licensee still obtained all substantial rights because the patent owners could

not withhold their consent unreasonably.  See 211 F.3d at 1251–52.  Because the patent

owners' consent could not be withheld unreasonably, the Federal Circuit found that the

"consent requirement [did] not significantly restrict the scope of [the plaintiff's] rights in

the . . . patent."  See id. at 1252.  Similarly, in Biopolymer Eng'g, Inc. v. Immunocorp, a

court in this District held that the "[p]laintiff's inability to transfer the agreement unless

[the patent owner] consent[ed]," was "not sufficiently restrictive to require" the court to

conclude that all substantial rights had not been transferred, because the agreement

provided that the patent owner's consent could not be "unreasonably withheld."  See No.

05-cv-536 (JNE/SRN), 2007 WL 627859, at *3 (D. Minn. Feb. 27, 2007).

Like the patent owners in Speedplay and Biopolymer, Disney was not permitted to

unreasonably withhold its consent if Candella sought to transfer or assign its rights under

the Agreement.  (See Poley Decl., Ex. I "First Amendment" § 2(c) [Doc. No. 22-4].)

Therefore, the Court finds that this consent requirement is "not sufficiently restrictive to

require" the Court to conclude that all substantial rights were not transferred to Candella.

See Biopolymer, 2007 WL 627859, at *3.

In sum, the Court finds that because Candella obtained a proprietary interest in the

patents-in-suit via an exclusive license to make, use, and sell, the products; the sole and

exclusive right to sue; the unfettered right to sublicense; and the right to assign its rights

under the Agreement, the Court finds that Disney granted to Candella all substantial

rights in the Disney Patents.

### 4. Disney's Retained Rights Do Not Negate the Court's Finding that Candella Has All Substantial Rights

Defendants claim that Candella did not obtain all substantial rights, and therefore lacks standing, because Disney retained several rights pursuant to the Agreement.  (See Liown's Mem. at 23 [Doc. No. 20].)  The Court finds that Disney's retained rights do not negate the Court's holding that, based on a totality of the factors, Candella was granted all substantial rights.

### a. Disney's Retained Right to Practice the Patent

First, Defendants argue that Candella was not granted all substantial rights as its rights are not "exclusive," because Disney maintained the right to practice its patents.  (See id.)  Defendants correctly note that Disney retained the nonexclusive right for itself, and its Affiliates, to "make, have made, use, sell, offer for sale and import the Licensed Products, within and outside the Product Categories" throughout the world.  (See Poley Decl., Ex. H, "2012 Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].)

The Liown Defendants contend that under this provision, "Disney effectively retained an unrestricted right to license third parties to practice the Disney Patents."  (See Liown's Mem. at 20 [Doc. No. 20].)  The Court disagrees.

The Liown Defendants misread the relevant provision of the Agreement.  Rather, Disney could authorize Liown and the other Defendants to manufacture and sell the products covered by the patents only under two unique circumstances, neither of which exists here.  First, Disney could acquire control of Defendants by either owning at least 50% equity or beneficial interest of Defendants, or by acquiring the right to vote for or

36

appoint a majority of the board of directors or other governing bodies of Defendants.

(See Poley Decl., Ex. H, "2012 Disney-Candella Agreement" § 1 [Doc. No. 22-4].)  If

this were the case, and Disney granted Liown more licenses than simply the Artificial

Flame Technology licenses (see id. § 2.2), then Defendants would qualify as Affiliates of

Disney that could practice the Schedule A Patents.  However, there is no indication in the

record that Disney has acquired, or intends to acquire, Defendants and license several

patents to them.  See WiAV, 631 F.3d at 1267 (explaining that "the ability of [the

original patent holder] to license its 'Affiliates' is also immaterial, as there is no

argument or evidence suggesting that the Defendants are [the original patent holder's]

Affiliates.").

Second, as Defendants correctly note, Disney could ask Defendants to "have [the

products] made" for Disney or its Affiliates.  (See Poley Decl., Ex. H, "2012 Disney-

Candella Agreement" § 2.2 [Doc. No. 22-4]; Liown's Mem. at 20 [Doc. No. 20].)

However, Disney could not permit Liown to make the candles for others, such as

Defendant Boston Warehouse, as Liown does currently.  (See Pl.'s Mem. at 30 [Doc. No.

36].)  The Agreement plainly states that "Disney expressly reserves for itself and its

Affiliates the right throughout the world to . . . make, have made, use, sell, offer for sale

and import the Licensed Products" throughout the world.  (See Poley Decl., Ex. H, "2012

Disney-Candella Agreement" § 2.2 [Doc. No. 22-4].)  The Court interprets this contract

language to mean that (1) Disney and its Affiliates could make, use, or sell the products,

and (2) Disney and its Affiliates could have the products made *for themselves*, but could

not have the products made *for third parties*.  (See id.)  However, nothing in the record

before the Court indicates that Disney has asked, or intends on asking, Liown to make the products for Disney.  Cf. WiAV, 631 F.3d at 1267.

The Agreement does not permit Disney to license Liown to make the products *for* Defendants, which in turn directly sell the products to the end customer.  If Disney attempted to create a contract permitting Liown to do so (without first acquiring control of Liown), then Candella, would have the right to sue both Disney and Liown for infringing on Candella's exclusive license.  See Alnylam Pharm., Inc. v. Tekmira Pharm. Corp., No. CIV.A. 12-10087-RWZ, 2012 WL 4857580, at *2 (D. Mass. Sept. 24, 2012) (explaining that because the plaintiff was granted the right to exclude all parties, including the patentee-defendant, from using the patents at issue in the plaintiff's field, the plaintiff has constitutional standing to sue the defendant for infringement in this field).  In sum, Disney did not retain "an unrestricted right to license third parties to practice the Disney Patents."  (Cf. Liown's Mem. at 20 [Doc. No. 20].)

Defendants rely exclusively on language from Textile Productions, to support their argument that "if a patentee-licensor is free to grant licenses to others, licensees under that patent are not exclusive licensees."  (See Liown's Mem. at 25 (citing Textile Productions, 134 F.3d at 1484) [Doc. No. 20]).  The Court disagrees with Defendants' characterization of the law.  In WiAV, the Federal Circuit clarified that Textile Productions does *not* stand for the proposition "that a party cannot be an exclusive license of a patent if others have the right to license the patent."  See WiAV, 631 F.3d at 1266 (finding that an exclusive licensee had standing to pursue infringement claims for a collection of patents that were subject to several prior nonexclusive licenses, with the

prior licensees having the right to transfer their rights and the right to sublicense to their affiliates and a few other third parties, because none of the named defendants were in the scope of the affiliates or third parties to whom those prior licensees could grant sublicenses).

Rather, Federal Circuit precedent establishes that a patentee may retain the right to make, use, and sell a patent and may lack standing, while an exclusive licensee may simultaneously have standing because it obtained all substantial rights to the patent.  See Azure, 771 F.3d at 1344, 1347.  In Azure, the court found that the patentee's retained right to practice the patent "ha[d] little force," because in addition to not practicing the patent as a matter of fact, the patentee's retained right to make, use, and sell the patent was nonexclusive.  See id.  The Federal Circuit explained that, "[w]e have held that a nonexclusive license confers no standing *on the licensee* because the licensee does not have a legally protected interest conferred by the Patent Act . . . That same logic applies even if it is the patent owner holding the nonexclusive right and the licensee holds the exclusionary rights."  Azure, 771 F.3d at 1344 (emphasis original).  Therefore, under Azure, Candella may hold an exclusionary license and have standing while Disney concurrently holds a nonexclusive license and lacks standing.[4]

It is precisely for this reason that this case is distinguishable from Ortho Pharm.

---

[4]     As Disney's license to practice is nonexclusive, Disney lacks constitutional standing to even be joined as party in this suit.  See Azure, 771 F.3d at 1347 (holding that because the patentee transferred all substantial rights in the patent to the licensee, including all exclusionary rights, the patentee "serves effectively as a nonexclusive licensee," and therefore "lacks standing to bring suit" and lacks standing "to even join the suit.").

Corp. v. Genetics Inst., Inc., where the Federal Circuit held that a nonexclusive licensee lacked standing to pursue an infringement action.  See 52 F.3d 1026, 1032–35 (Fed. Cir. 1995).  In Ortho, the licensee "concede[d]" that it shared a nonexclusive right to make, use and sell the products with the patentee, because the patentee had the "right to license others to do the same."  See id. at 1033.  For this reason, the Federal Circuit held that the licensee did not have "beneficial ownership of some of the patentee's proprietary rights." Id. at 1034.  In contrast, here, Candella does not concede that it had a nonexclusive license, nor does it concede that Disney had the unrestricted right to license others to make, use, and sell the product.  Instead, Candella claims that it had an exclusive license and Disney only retained the limited right to practice the patent for itself and its Affiliates.

Defendants contend that Candella lacks all substantial rights because of this case's similarity to (1) Abbott Labs. v. Diamedix Corp., 47 F.3d 1128 (Fed. Cir. 1995); (2) AsymmetRx, Inc. v. Biocare Medical, LLC, 582 F.3d 1314 (Fed. Cir. 2009); (3) Pfizer Inc. v. Elan Pharmaceutical Research Corp., 812 F. Supp. 1352 (D. Del. 1993); (4) Agrashell, Inc. v. Hammons Products Co., 352 F.2d 443 (Fed. Cir. 1965); and (5) Toshiba Corp. v. Wistron Corp., 270 F.R.D. 538 (C.D. Cal. 2010).  (See Liown's Reply at 4–6 [Doc. No. 45].)  However, like Ortho, all of these cases are distinguishable.

In all five of the cases Defendants rely on, the court held that the licensee did not obtain all substantial rights.  But, unlike the patentees in Abbott Labs., Pfizer, and Agrashell, Disney relinquished its complete right to sue.  See Abbott Labs., 47 F.3d at 1132 (explaining that the patentee retained the right to sue if the licensee failed to do so,

40

and the patentee also had the right to join litigation brought by licensee); Pfizer, 812 F.

Supp. at 1374 (stating that the patentee had the right of first refusal to enforce the patent);

Agrashell, 352 F.2d at 446 (explaining that the patentee could participate in infringement

litigation brought by the licensee).  Disney does not have the right to sue for infringement

if Candella fails to do so, nor does it have the right to join a suit for infringement initiated

by Candella.  Cf. Abbott Labs., 47 F.3d at 1132; Pfizer, 812 F. Supp. at 1374; Agrashell,

352 F.2d at 446.

Also, unlike the patentee in Toshiba, Disney only retained the nonexclusive, as

opposed to exclusive, right to practice the patents.  Cf. Toshiba, 270 F.R.D. at 540

(explaining that both the patentee and the licensee had the "non-exclusive right to make,

sell and use the covered inventions under the [a]greement").  And unlike the licensee in

Toshiba, Candella obtained an *exclusive* license to the patents.  Cf. id.

Moreover, Disney's retained rights to the patents are so minimal that, unlike the

patentees in Agrashell and AsymmetRx, Disney cannot grant licenses to third parties.

See Agrashell, 352 F.2d at 446; AsymmetRx, 582 F.3d at 1320 (stating that the patentee

had the right to provide the product to non-profit or governmental institutions for

research purposes).  Rather, Disney only retained the right to make, use, and sell the

products, or have the products made for itself and its Affiliates.  As Disney's Affiliates

are controlled by Disney, the Court considers the Affiliates to be the same entity as

Disney for purposes of standing.  See Kalman v. Berlyn Corp., 914 F.2d 1473, 1480 (Fed.

Cir. 1990) opinion clarified, No. 89-1371, 1991 WL 345039 (Fed. Cir. Mar. 4, 1991)

(explaining that it was "clear from the record that" the plaintiff and his company, of

which the plaintiff owned 50%, were a "single entity" for purposes of standing).

Disney also is prohibited from unreasonably withholding its consent if Candella wishes to assign its rights, unlike the patentee in Abbott Labs., 47 F.3d at 1132. Furthermore, Disney has absolutely no control over how Candella practices the patents, unlike the patentee in AsymmetRx.  Cf. AsymmetRx, 582 F.3d at 1320 (explaining that the patentee had the right to control how the licensee used the product).

And finally, unlike the patentee in Toshiba, Disney did not retain the unilateral and absolute right to terminate the Agreement with Candella.  Cf. Toshiba, 270 F.R.D. at 543.  Rather, both parties had the mutual right to terminate their contract if both parties agreed to terminate, or if either party committed a material breach.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 7.2.2 [Doc. No. 22-4].)

In sum, this case is sufficiently distinguishable from other cases in which courts have held that the patentee's retained right to practice the patent indicated that all substantial rights had not been transferred.

### b.  Disney's Retained Right to Terminate the Agreement

As the Court noted above, the Agreement permits either party to terminate the contract if the parties mutually agree, or if either party "material[ly] breach[es]" a term of the contract. (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 7.2.2 [Doc. No. 22-4].)  However, Disney's retained right to terminate the Agreement upon specified conditions is "not dispositive" of whether all substantial rights were transferred to Candella.  See Azure, 771 F.3d at 1344–45 (explaining that the patentee's power to terminate the agreement if the licensee fails to satisfy the specified benchmarks is not

dispositive of whether all substantial rights were transferred); <u>Propat</u>, 473 F.3d at 1191–92 (same).

Rather, if a contract provides the parties with a rolling renewal option, then that contractual provision may suggest that all substantial rights were transferred to the licensee.  See <u>Azure</u>, 771 F.3d at 1347 (explaining that a short patent term life, coupled with a rolling renewal cycle that can extend to the end of the patent's term, may provide another indicator that the patentee transferred all substantial rights to the licensee).  Here, the Agreement permitted Candella to renew its license for the remainder of the life of the patent, plus six years.  (See Merrill Decl., Ex. 1 "Second Amendment" § 2 (amending § 7.1 of the 2012 Disney-Candella Agreement) [Doc. No. 37-1].)

Thus, the Court's conclusion that all substantial rights were transferred to Candella is bolstered by the fact that the Agreement allowed Candella to renew the contract, even though the Agreement also allowed Disney to terminate the contract upon specified conditions.

### c.  Disney's Retained Right to Receive Royalties

Disney also retained the right to receive royalty payments.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" § 5.1 [Doc. No. 22-4]; Poley Decl., Ex. I, "First Amendment" § 3(a), (b) [Doc. No. 22-4].)  Nonetheless, the Federal Circuit has held that "economic interest alone does not defeat a transfer of substantial rights in the face of the factors . . . that strongly indicate [a licensee's] ownership."  See <u>Azure</u>, 771 F.3d at 1344 (citing <u>Propat</u>, 473 F.3d at 1191 (explaining that "the fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent . . . does

not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent.")); see also Biopolymer, 2007 WL 627859, at *3.

In Vaupel, the Federal Circuit explicitly held that "the right to receive infringement damages" can be considered "merely [as] a means of compensation under the agreement," and thus the receipt of infringement damages is "not inconsistent with an assignment [to the licensee]." Vaupel, 944 F.2d at 875 (citing Rude v. Westcott, 130 U.S. 152, 162–63 (1889) (explaining that retention of a portion of "sales, royalties, or settlements, or other sources" does not limit the assignment of a patent)). Thus, the mere fact that Disney retained the right to receive royalty payments does negate that the most significant factors indicate that all substantial rights were transferred to Candella.

### d.  Disney's Right to Remain Informed About Candella's Sublicensing Agreements

According to the Agreement, Candella was obligated to inform Disney of its intent to grant a sublicense at least thirty days before doing so.  (See Poley Decl., Ex. I "First Amendment" § 2(b) [Doc. No. 22-4].)  The Federal Circuit has held that even a patentee's right to veto sublicenses was only a "minor derogation" from the substantial rights that the licensee was granted.  See Vaupel, 944 F.2d at 875 (explaining that the patentee's sublicensing veto power "did not substantially interfere with the full use by [the licensee] of the exclusive rights under the patent").  Here, Disney was not granted the power to veto Candella's sublicenses.  Rather, Candella merely had the obligation to inform Disney about its sublicensing agreements.  Since a patentee's power to veto a licensee's sublicenses does not necessarily indicate that the patentee retained ownership

of the patent for standing purposes, here, Disney's right to remain informed about Candella's sublicenses certainly does not indicate that Disney retained ownership of the patent.

### e.  Disney's Formal "Title to" the Patents

Finally, the fact that the Agreement states that Disney retained formal "title to" the patents and was responsible for maintaining the patents does not necessarily indicate that Disney is the owner of the patent for purposes of standing.  (See Poley Decl., Ex. H "2012 Disney-Candella Agreement" §§ 9.1, 12 [Doc. No. 22-4].)  As the Federal Circuit explained in Speedplay, "[a] party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights."  See 311 F.3d at 1250.  Accordingly, the Agreement's characterization of Disney as the "owner" of the patent is insufficient to reverse the Court's finding that Candella was granted all substantial rights.  The Court also notes that although formal retention of ownership in an agreement between the parties sometimes bolsters a court's finding that all substantial rights were not transferred, here, the balance of factors weighs in favor of finding that Candella was in fact granted all substantial rights.  But see Propat, 473 F.3d at 1191 (holding that all substantial rights had not been transferred, because the licensor received royalties and had veto power over licensee's litigation and assignment decisions; and finding that the agreement's express characterization of the licensor as "the owner of the patent" offered more support for the court's holding).

On balance, the Court finds that because Disney's retained rights do "not

substantially interfere with the full use of [Candella's] exclusive rights under the patent," AsymmetRx, 582 F.3d at 1320, Candella was granted all substantial rights.

### C. Candella Had Standing to Bring Suit and Pre-Merger Luminara Had Standing to Sue as a Co-Plaintiff

Before entering into a sublicense agreement with pre-merger Luminara, Candella had obtained all substantial rights in the patents-in-suit from Disney.  The Court must now determine whether the Sublicense between Candella and pre-merger Luminara altered the distribution of these rights in any substantive way.  When determining whether all substantial rights were transferred from Candella to pre-merger Luminara, the Court treats Candella as the de facto "assignee" of the patent, and pre-merger Luminara as the "licensee."

According to the Sublicense, Candella appointed pre-merger Luminara as its "exclusive sourcing agent and distributor . . . with the exclusive right to manufacture, have manufactured, sell, promote and otherwise distribute Products to Customers in the Territory, subject to the terms and conditions of this Agreement."  (See Merrill Decl., Ex. 4 "Sublicense" § 2.01 [Doc. No. 37-1].)  Therefore, by the terms of the Sublicense itself, pre-merger Luminara had a proprietary interest in the patents-in-suit because it obtained Candella's exclusive license to make, use, and sell the products.[5]

---

[5]      The Court notes that at the same time that pre-merger Luminara was granted an exclusive sublicense, Disney still retained its nonexclusive license.  Although both licenses were valid at the same time, Federal Circuit law permits their co-existence because one party may maintain an exclusive license while another party practices a nonexclusive license for the same patent.  See WiAV, 631 F.3d at 1266.

Pre-merger Luminara also received the right to bring suit to enforce the patents. (See id. § 11.03.)  However, Candella similarly maintained the right to bring suit to enforce the patents.  (See id.)  The Sublicense additionally provided that Candella was entitled to "all damages[, not including litigation costs,] which may be awarded or agreed upon in settlement," regardless of whether pre-merger Luminara or Candella initiated the infringement suit.  (See id.)

Although pre-merger Luminara obtained a proprietary interest in the patents, it did not receive all substantial rights.  As the Court explained above, "the right to sue for infringement . . . is particularly dispositive" when determining whether a transfer of all substantial rights has occurred.  See Vaupel, 944 F.2d at 875–76.  According to the Federal Circuit, "[w]here the licensor[,Candella,] retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee[,pre-merger Luminara.]"  See Mann, 604 F.3d at 1361.  Here, although pre-merger Luminara was granted the right to bring suit to enforce the patents, Candella concurrently retained the right to sue.  Therefore, because Candella retained this right, the Court is precluded from finding that all substantial rights were transferred to pre-merger Luminara.  The Court's holding is supported by the fact that Candella not only maintained the right to sue, but it also retained the right to recover all of the profits from a suit, regardless of which entity initiated suit.  Given the fact that the most dispositive factor indicates that Candella retained all substantial rights, the Court need not discuss the other rights that were assigned or retained under the Sublicense.

Accordingly, when this suit was filed, Plaintiff Candella maintained all substantial rights in the patents-in-suit and had both constitutional and prudential standing to bring suit.  See Mann, 604 F.3d at 1359 (explaining that if the licensor did not transfer all substantial rights, then it retained the right to sue for infringement).  Plaintiff pre-merger Luminara, on the other hand, only had constitutional standing because although it had a proprietary interest in the form of an exclusive sublicense, it lacked prudential standing because it did not have all substantial rights.  Nonetheless, because pre-merger Luminara brought suit jointly with Candella, the prudential standing requirement was satisfied.  See Prima Tek II, 222 F.3d at 1377; Intellectual Prop. Dev., Inc., 248 F.3d at 1347–48.  As the Court noted above, an exclusive licensee without all substantial rights may sue as long as the patentee who retains all substantial rights is joined as a co-plaintiff.  See Morrow, 499 F.3d at 1340.  Therefore, both Plaintiffs had standing to bring suit when the Complaint was first filed.[6]

Moreover, the Court notes that simply because Candella exercised its right to sublicense, by granting an exclusive sublicense to pre-merger Luminara, does not suggest that Candella relinquished its proprietary interest in the patents-in-suit.  (See Pl.'s Mem. at 25 [Doc. No. 26].)  This principle is evidenced by the fact that the Federal Circuit has consistently held that if a party is solely an exclusive licensee that lacks all substantial

---

[6]     Plaintiffs argue that Candella and pre-merger Luminara had standing to bring suit because of the "commonality in ownership" between the two entities.  (See Pl.'s Mem. at 37 (citing Kalman v. Berlyn Corp., 914 F.2d 1473 (Fed. Cir. 1990) [Doc. No. 36].)  Because the Court finds that pre-merger Luminara had standing to bring suit as a co-Plaintiff of Candella, the Court need not reach Plaintiffs' argument about the commonality of ownership between the two companies.

rights, then the patent owner must be joined to satisfy prudential standing concerns.  See
Prima Tek II, 222 F.3d at 1377; Abbott Labs., 47 F.3d at 1131; Rite-Hite, 56 F.3d at
1552; Mentor H/S, 240 F.3d at 1017; Textile Prods., 134 F.3d at 1484.  Because every
plaintiff must have constitutional standing in order to be joined as a co-plaintiff, the
joined patent owner must necessarily also have constitutional standing; and thus, the
patent owner must maintain a proprietary interest in the patents, even though it previously
granted an exclusive license or sublicense.[7]  See Morrow, 499 F.3d at 1342.  In sum,
when this suit was initially filed, Candella had standing to bring suit independently, and
pre-merger Luminara had standing to sue as Candella's co-plaintiff.

### D.  Post-Merger Luminara Has Standing

When pre-merger Luminara merged with Candella, post-merger Luminara was
created and subsumed both entities' rights.  Because Candella maintained all substantial
rights, and thus had constitutional and prudential standing to bring suit, post-merger
Luminara, necessarily continues to have constitutional and prudential standing to bring
suit.  Federal Rule of Civil Procedure 25(c) provides that, "[i]f an interest is transferred,
the action may be continued by or against the original party unless the court, on motion,
orders the transferee to be substituted in the action or joined with the original party."  See
Fed. R. Civ. P. 25(c).  Therefore, Rule 25(c) suggests that the newly created company,
post-merger Luminara, may be properly substituted as the sole Plaintiff in this action.  Cf.

---

[7]      Although situations may exist in which no party has standing to sue (see Liown's
Reply at 9 [Doc. No. 45]), such as when a nonexclusive licensee is given the exclusive
right to enforce the patent against a particular defendant, Fairchild Semiconductor Corp.
v. Power Integrations, Inc., 630 F. Supp. 2d 365, 372–73 (D. Del. 2007), this is not such a
case.

ISI Int'l, 2002 WL 230904, at *1.  Therefore, post-merger Luminara sufficiently satisfied

its burden of proving that it has standing in this case.  See Osborn v. United States, 918

F.2d 724, 730 (8th Cir. 1990).

### E.  Plaintiff's Declaratory Judgment Claims Are Not Anticipatory

Finally, the Court addresses Defendants' argument that Plaintiff post-merger

Luminara's[8] declaratory judgment claims are anticipatory and should accordingly be

dismissed.  (See Liown's Mem. at 29–32 [Doc. No. 20].)  Plaintiff alleges two

declaratory judgment claims against the Liown Defendants.  (See Third Am. Compl. ¶¶

31 –50 [Doc. No. 131].)  In Count II, Plaintiff seeks a declaratory judgment that it is not

infringing on Liown's '986 patent.  (See id. ¶¶ 31–45.)  In Count III, Plaintiff seeks a

declaratory judgment that Liown's '986 patent is invalid.  (See id. ¶¶ 46–50.)  Although

Defendants seek dismissal of these claims, Plaintiff argues that its claims for declaratory

judgment are not anticipatory and should not be dismissed.  The Court agrees.

### 1.  Jurisdiction under the Declaratory Judgment Act

The Supreme Court has interpreted the Declaratory Judgment Act to grant federal

courts "unique and substantial discretion in deciding whether to declare the rights of

litigants."  Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995).  However, such

discretion must be grounded in an actual controversy under "all the circumstances."  See

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).

---

[8]    Whereas the Court referred to "Plaintiffs," in the plural form, when discussing the
transfer of all substantial rights to Candella and pre-merger Luminara, from this point
forward, the Court refers to "Plaintiff," in the singular form, now that post-merger
Luminara is the only remaining plaintiff in this case.

The Declaratory Judgment Act (DJA) states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  See 28 U.S.C. § 2201(a) (2012).  The Supreme Court has interpreted the "actual controversy" requirement in the DJA to be identical to the cases and controversies requirement in Article III.  See MedImmune, Inc., 549 U.S. at 127; see also Teva Pharms. USA, Inc. v. Novartis Pharmas. Corp., 482 F.3d 1330 (Fed. Cir. 2007).

Under the DJA, the plaintiff has the burden of demonstrating that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  See Teva, 482 F.3d at 1337 (quoting MedImmune, 549 U.S. at 127).  Therefore, to survive dismissal, Plaintiff must show that the threat of injury is sufficiently (1) immediate, and (2) real, to warrant the issuance of a declaratory judgment.  See id. at 1338 (quoting MedImmune, 549 U.S. at 127).  Moreover, even assuming Plaintiff shows the immediacy and reality of the controversy, the Court must also determine whether it wishes to exercise its discretion to grant jurisdiction for these declaratory judgment claims.  See Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 883 (Fed. Cir. 2008).

## 2.  Defendants' Actions Present an Actual Controversy

Here, Plaintiff sufficiently alleges facts showing a substantial controversy between the parties.  Below, the Court discusses the immediacy of the controversy, the reality of

the controversy, and the Court's discretion to grant jurisdiction.

### a.  Immediacy of the Controversy

In Sandoz, Inc. v. Amgen, Inc., the Federal Circuit addressed the "immediacy"

requirement.  See 773 F.3d 1274, 1278 (Fed. Cir. 2014).  The court explained that when

determining whether the controversy is immediate, courts should consider "how far in the

future the potential infringement is, whether the passage of time might eliminate or

change any dispute, and how much if any harm the potential infringer is experiencing, at

the time of the suit, that an adjudication might redress."  See id.

> Although the controversy must be immediate:
>
> Article III does not mandate that the declaratory judgment defendant have
> threatened litigation or otherwise taken action to enforce its rights before a
> justiciable controversy can arise, and the Supreme Court has repeatedly
> found the existence of an actual case or controversy even in situations in
> which there was no indication that the declaratory judgment defendant was
> preparing to enforce its legal rights.

Danisco U.S. Inc. v. Novozymes A/S, 744 F.3d 1325, 1330 (Fed. Cir. 2014) (citing

MedImmune, 549 U.S. at 132 n.11).

For instance, in Danisco, the Federal Circuit weighed the "history of the patent

litigation between the same parties involving related technologies, products, and patents

in another circumstance  . . . in favor of the existence of subject matter jurisdiction . . . ."

Id. at 1331.  The Danisco Court accordingly held that the patent owner's "activities . . .

demonstrate[d] that it ha[d] 'engaged in a course of conduct that show[ed] a preparedness

and willingness to enforce its patent rights.'"  Id. at 1332 (quoting SanDisk Corp. v.

STMicroelectronics, Inc., 480 F.3d 1372, 1383 (Fed. Cir. 2007) (concluding that the

patent owner, in "[h]aving approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it [did] not intend to sue, [the patent owner was] engaged in the kinds of 'extra-judicial patent enforcement with scare-the-customers-and-run tactics' that the Declaratory Judgment Act intended to obviate.")).

On the other hand, the Federal Circuit has held that "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties . . . ." Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1362 (Fed. Cir. 2009). Nonetheless, in Hewlett-Packard, the Federal Circuit found that an actual controversy existed because the patent owner "took the affirmative step of twice contacting HP directly, making an implied assertion of its rights under the . . . patent against HP's . . . products, and HP disagreed." Id. at 1364.

Here, Plaintiff alleges that when negotiations regarding the use and manufacture of the Artificial Flame Technology broke down with Liown, Defendants threatened to sue for infringement of Liown's '986 patent. (See Third Am. Compl. ¶ 33 ("In the [August 2012] letter, counsel for Liown . . . threatened enforcement of future patent rights.") [Doc. 131]; Merrill Decl., Ex. 22 "Letter from Liown to David Baer" [Doc. No. 37-4].) As a result, Candella and pre-merger Luminara immediately filed this lawsuit, including declaratory judgment claims. Defendants' willingness to enforce their patent is further evidenced by Liown's concession that it "put Luminara on notice that if negotiations . . . were unsuccessful, Liown would sue Luminara for infringement of the '986 patent."

(See Liown's Mem. at 10 [Doc. 20]).  Therefore, Plaintiff has shown that Defendants

threatened immediate litigation to enforce its rights.  See Danisco, 744 F.3d at 1330.

And, at the very least, Plaintiff has demonstrated that Defendants took an affirmative

step, demonstrating their "preparedness and willingness to enforce [their] patent rights,"

id. at 1332, by sending the aforementioned letter and terminating the parties' prior

settlement agreement.

The Court also notes that the dispute between the parties in this case is neither

remote, nor speculative.  In Matthews Intern. Corp. v. Biosafe Eng'g, LLC, the Federal

Circuit held that because the plaintiff failed to allege facts that its device would be used

in a manner that infringed the defendant's method patents, "its dispute . . . [was] too

remote and speculative to support the exercise of declaratory judgment jurisdiction."  See

695 F.3d 1322, 1329 (Fed. Cir. 2012).  In contrast, here, Plaintiff has alleged sufficient

facts to show that Defendants believed that the Disney Patents were currently being used

in a way that infringed Liown's '986 patent.  (See Pl.'s Mem. at 9–13 [Doc. 36]; Compl.

¶ 23 [Doc. 13].)  Thus, the threat of suit was not remote.

Additionally, neither party argues that "the passage of time might eliminate or

change [the] dispute."  Sandoz, Inc., 773 F.3d at 1278.  If Defendants correctly assert that

Plaintiff is infringing on the '986 patent, then the passage of time will only increase the

amount of damages for which Plaintiff is potentially liable.  See Micron Technology, Inc.

v. Mosaid Technologies, Inc., 518 F.3d 897, 902 (Fed. Cir. 2008).  Allowing these

damages to accrue while Plaintiff waits for Defendants to file suit is in stark contrast to

the objective of the DJA.  See id.  (explaining that "'[t]he purpose of the Declaratory

Judgment Act . . . in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights.'") (quoting <u>Goodyear Tire & Rubber Co.</u> <u>v. Releasomers, Inc.</u>, 824 F.2d 953, 956 (Fed. Cir. 1987)). Therefore, the Court finds that Plaintiff's potential injury is both imminent and redressable.

### b.  Reality of the Controversy

In addition to showing that the controversy is immediate, Plaintiff must allege that the threat of injury is "real," so as to avoid the Court issuing an advisory opinion.  <u>See</u> <u>MedImmune</u>, 549 U.S. at 127.  A patent controversy satisfies this "reality" requirement if the plaintiff alleges facts showing that the patents-at-issue conflict or overlap in some way.  "In the context of patent litigation, the reality requirement is often related to the extent to which the technology in question is 'substantially fixed' as opposed to 'fluid and indeterminate' at the time declaratory relief is sought.'"  <u>See</u> <u>Matthews</u>, 695 F.3d at 1330.  This is because, "[t]he greater the variability of the subject of a declaratory-judgment suit . . .  the greater the chance that the court's judgment will be purely advisory."  <u>Id.</u>

Accordingly, here, Plaintiff satisfies the "reality" requirement for bringing a declaratory judgment claim because it presents facts and supporting documents that show that Liown's '986 patent has the same features as the Disney Patents.  (<u>See</u> Pl.'s Mem. at 10 [Doc. No. 36]; Poley Decl., Ex. O "'986 Patent" [Doc. No. 22-6].)  Moreover, the technology in question is not "fluid and indeterminate" because both parties use fixed technology.  Given the "reality" of this dispute, if the Court issues a declaratory judgment about the parties' patents, it will not be an advisory opinion.

### c. District Court Discretion

"Even assuming that the immediacy and reality prerequisites for declaratory judgment relief have been met, the district court's exercise of its declaratory judgment authority is discretionary."  See Cat Tech LLC, 528 F.3d at 883.  "When there is no actual controversy, the court has no discretion to decide the case.  When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary."  Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991).  The Court may exercise this discretion if "resolving the case serves the objectives for which the Declaratory Judgment Act was created."  Cat Tech LLC, 528 F.3d at 883.

Here, as the Court established above, the immediacy and reality prerequisites are satisfied in this case.  Thus, the Court may exercise its discretion if resolving this case serves the objectives of the DJA.  See id.  By threatening to sue, Defendants have left Plaintiff with the "choice between abandoning [its] rights or risking prosecution."  See MedImmune, 549 U.S. at 773.  And the DJA was meant to ameliorate this very dilemma.  See id. (citing Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967)).  Therefore, the Court exercises its discretion and grants jurisdiction for Plaintiff's Counts II and III.

Defendants contend that the Court should deny jurisdiction because although generally the first-filed rule provides that "in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case,'" Nw. Airlines, Inc. v. Am. Airlines, Inc., 989 F.2d 1002, 1005 (8th Cir. 1993), here, several compelling circumstances exist that weigh in favor of denying jurisdiction.  (See Liown's Mem. at 29–31 [Doc. No. 20].)  As the Court noted above, immediately after Candella and pre-

merger Luminara filed suit in this case, Liown filed suit against Luminara, <u>Shenzhen</u> <u>Liown Electronic Co., Ltd. v. Luminara Worldwide, LLC, et al.</u>, No. 14-cv-3112 (SRN/FLN).  Defendants contend that Liown's suit should take precedence over this first-filed action.  Specifically, Defendants argue that the first-filed rule "is not intended to be rigid, mechanical, or inflexible," but rather must "be applied in a manner best serving the interests of justice," and when compelling circumstances exist, the first-filed rule should not apply.  <u>See</u> <u>Nw. Airlines, Inc.</u>, 989 F.2d at 1005.

In <u>Northwest Airlines</u>, the United States Court of Appeals for the Eighth Circuit explained that "[t]o conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing *among possible venues* when parallel litigation has been instituted in *separate courts*, to the party who first establishes jurisdiction." <u>Nw. Airlines</u>, 989 F.2d at 1006 (emphasis added).  Therefore, the first-filed rule, and the compelling circumstances exception to the first-filed rule, do not apply here because both lawsuits were filed in the same District and are before the same district court judge.  <u>See</u> <u>Arctic Cat, Inc. v. Polaris Indus. Inc.</u>, Nos. 13-cv-3579 and 13-cv-3595 (JRT/FLN), 2014 WL 5325361, *14 (D. Minn. Oct. 20, 2014) (explaining that "the first-filed rule is not intended to govern the resolution of two lawsuits filed in the same district and assigned to the same judge").  The rule and the exception to the rule were developed to address situations in which two cases were filed concurrently in two different districts. <u>See</u> <u>id.</u>; <u>Nw. Airlines</u>, 989 F.2d at 1006.  Defendants concede as much in the second-filed action.  <u>See</u> <u>Shenzhen Liown Elecs. Co., Ltd. v. Luminara Worldwide, LLC, et al.</u>, No. 14-cv-3112, Liown's Mem. at 8 [Doc. No. 25] (arguing that the first-filed rule does not

apply in this case because "the cases are filed in the same (rather than separate) judicial districts").

In sum, because Plaintiff has alleged sufficient facts to show that its potential for injury is actual, imminent, and capable of redress, its declaratory judgment claims are not anticipatory. Therefore, Defendants' Motions to Dismiss Plaintiff's Counts II and III as anticipatory are denied.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. The Liown Defendants' Motion to Dismiss First Amended Complaint [Doc. No. 18] is **DENIED**.

2. Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss First Amended Complaint [Doc No. 46] is **DENIED**.

3. The Liown Defendants' and Defendants Abbott of England (1981), Ltd. and Boston Warehouse Trading Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 94] is **DENIED**.

4. Defendant Tuesday Morning Corp.'s Motion to Dismiss Second Amended Complaint [Doc. No. 111] is **DENIED**.

5. Defendant Central Garden & Pet Co.'s Motion to Dismiss Second Amended Complaint [Doc. No. 113] is **DENIED**.

6. Defendant Zulily, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 114] is **DENIED**.

7. Defendant The Light Garden, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 116] is **DENIED**.

8. Defendants BJ's Whole Sale Club, Inc., Smart Candle, LLC, and Von Maur, Inc.'s Motion to Dismiss Second Amended Complaint [Doc. No. 128] is **DENIED**.

9.   Defendants' Motion to Dismiss Third Amended Complaint [Doc. No. 135] is
     **DENIED**.

10.  The parties are ordered to show cause ten days from the date of this Order why the
     Order should not be unsealed, and to specify any portion warranting redaction.


Dated:  April 3, 2015                      s/Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge