# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Luminara Worldwide, LLC, | Case No. 14-cv-3103 (SRN/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd., Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., BJ's Wholesale Club, Inc., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., Ambient Lighting, Inc., The Light Garden, Inc., and Central Garden & Pet Co., | **[FILED UNDER SEAL]** |
| Defendants. | |

Daniel R. Hall, Joseph W. Anthony, and Courtland C. Merrill, Anthony Ostlund Baer & Louwagie PA, 90 South 7th Street, Suite 3600, Minneapolis, MN 55402; Ryan S. Dean, Fish & Tsang LLP, 2603 Main Street, Suite 1000, Irvine, CA 92614, for Plaintiff.

Devan V. Padmanabhan, Erin O. Dungan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendants Boston Warehouse Trading Corp., Abbott of England (1981), Ltd., Von Maur, Inc., Zulily, Inc., Smart Candle, LLC, Tuesday Morning Corp., The Light Garden, Inc., and Central Garden & Pet Co.

Devan V. Padmanabhan, Nadeem Schwen, Brooks F. Poley, Lukas Dustin Jonathon Toft, and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629; Michael J. Pape, Fish & Richardson PC, 60 South 6th

Street, Suite 3200, Minneapolis, MN 55402, for Defendant BJ's Wholesale Club, Inc.

Lukas Dustin Jonathon Toft and Paul J. Robbennolt, Winthrop & Weinstine, PA, 225 South 6th Street, Suite 3500, Minneapolis, MN 55402-4629, for Defendant Ambient Lighting, Inc.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [Doc. No. 50].  For the reasons set forth below, the Court grants Plaintiff's motion.

## II.    BACKGROUND

### A.  The Parties and Plaintiff's Claims

Luminara Worldwide, LLC, ("Luminara" or "Plaintiff") alleges that Defendants are offering for sale and selling flameless candles that infringe Plaintiff's patents.  (See Pl.'s Mem. at 1 [Doc. No. 52].)  "Luminara's Artificial Flame Technology was originally developed by Disney."  (See id. at 2 [Doc. No. 52].)  Although Disney initially licensed the Artificial Flame Technology to Candella, LLC in 2008 (see id.), after Candella and Luminara merged on December 31, 2014, Luminara became the exclusive licensee for the Artificial Flame Technology, with standing to enforce, without joinder of Disney, a number of patents, including (1) United States Patent No. 7,837,355 ("the '355 patent"), (2) United States Patent No. 8,070,319 ("the '319 patent"), (3) United States Patent No. 8,534,869 ("the '869 patent"), and (4) United States Patent No. 8,696,166 ("the '166 patent").   (See 4/3/15 Order Filed Under Seal [Doc. No. 143].)

Plaintiff seeks a preliminary injunction that (1) enjoins Defendants from

manufacturing, distributing, offering for sale, selling, or importing any moving flameless candles to any of Plaintiff's customers, and (2) orders Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers.  (See Pl.'s Mem. at 13 [Doc. No. 52].)

Although this lawsuit was initially filed against Defendants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, and Shenzhen Liown Electronics Co. Ltd. (hereinafter, "Liown" or "the Liown Defendants") (see Compl. ¶ 12 [Doc. No. 1]), Plaintiff later amended its Complaint to add several additional Defendants that sell flameless candles manufactured by Liown throughout the United States.  (See generally First Am. Compl. [Doc. No. 13]; Second Am. Compl. [Doc. No. 88].)

Plaintiff alleges nine counts against Defendants, including but not limited to patent infringement, tortious interference, and trademark infringement.  (See generally Third Am. Compl. [Doc. No. 131].)  For purposes of its Motion for Preliminary Injunction, Plaintiff focuses solely on two of its claims.  Specifically, Luminara argues that the Court should grant a preliminary injunction because it is likely to succeed on (1) its claim that Defendants are infringing the '166 patent; and/or (2) its claim that the Liown Defendants and Boston Warehouse tortiously interfered with Luminara's contracts.  (See Pl.'s Mem. at 14–15 [Doc. No. 52]; Third Am. Compl. ¶¶ 26, 60–67 [Doc. No. 131].)

### B.  Patent Infringement Claim

Luminara argues that Liown's moving flameless candles utilize every aspect of claim 1 of its '166 patent, and therefore literally infringe claim 1.  Plaintiff contends that claim 1 of the '166 patent "claims the core invention of Disney's Artificial Flame

Technology." (See Pl.'s Mem. at 4 [Doc. No. 52].)  Claim 1 claims a pendulum with a "flame silhouette" that pivots on a support element through a hole in the body of the pendulum to create a realistic flickering flame effect.  (See Merrill Decl., Ex. 5, "'166 Patent" [Doc. No. 55-1].)  Claim 1 provides as follows:

> 1. A pendulum member for generating a flickering flame effect, comprising:
>
> a [1] **body** with upper and lower portions;
>
> a [2] **flame silhouette** element extending outward from the upper portion of the body;
>
> and [3] **a hole** in the body below the flame silhouette element, wherein the hole is configured to receive [4] **a flame support** element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

(Id. at claim 1 (bold and bracketed numbering added).)  However, claim 1 does not claim the specific mechanism or manner for causing the pendulum to pivot.  (See Patton Decl. ¶ 6 [Doc. No. 54].)  Therefore, as Doug Patton, the co-inventor of the '166 patent, explains, "the invention can be practiced with one, or two, or ten pendulums."  (See id.)

Figure 1 of the '166 patent shows a two-stage, or two pendulum design for a flameless candle made in accordance with the invention claimed in claim 1.  (See id. ¶ 5.)  However, the invention "can also be implemented in a single-stage design using a single pendulum."  (See id.)  In fact, Figure 7 of the '166 patent shows a single-stage, or single pendulum design that utilizes the technology claimed in claim 1.  (See Merrill Decl., Ex. 5, "'166 Patent," Fig. 7 [Doc. No. 55-1].)  Plaintiff explains that the full scope of claim 1 of the '166 patent is supported by the written disclosure of the earlier-filed provisional application filed on September 30, 2008.  (See Pl.'s Mem. at 5 (citing Patton Decl. ¶ 6)

[Doc. No. 52].)  Claim 1 describes the technology visually depicted inside the circle below:



**FIG. 1**

**Fig. 1 from Sept. 30, 2008 Provisional Pat. Appl. 61/101,611**

(Merrill Decl., Ex. 7, "Provisional Application 61/101,611," Fig. 1 [Doc. No. 55-1].)

Luminara granted Liown the right to distribute candles using the Artificial Flame Technology in China and parts of Asia.  (See Merrill Decl., Ex. 15, "NDA" at 1 [Doc. No. 55-5].)  However, Liown was not authorized to sell flameless candles using Disney's Artificial Flame Technology.  (See id.)  Luminara argues that Liown copied Disney's Artificial Flame Technology after it obtained details about the technology in a non-disclosure agreement ("NDA").  (See Pl.'s Mem. at 6 [Doc. No. 52]; Merrill Decl., Ex.

14, "Product Development and Supply Agreement" [Doc. No. 55-5]; Merrill Decl., Ex. 15 "NDA" [Doc. No. 55-5].)

Plaintiff explains that in June 2010, the parties were unable to agree on a price for the candles, and Liown subsequently filed a patent application in China claiming ownership to a moving flameless candle. (See Pl.'s Mem. at 7 [Doc. No. 52].) Luminara alleges that these flameless candles rely on exactly the same technology as Disney's Artificial Flame Technology. (See id.) In 2012, Liown began selling its own flameless candles and Plaintiff filed suit against Liown in November 2012 for patent infringement. See Candella, LLC v. Liown Elecs. Co. Ltd., No. 12-cv-2803 (PJS/JJK) (D. Minn. Nov. 2, 2012) [Doc. No. 1]. Although the parties initially reached a settlement in 2013, negotiations fell apart, and on August 5, 2014, Liown's counsel notified Luminara that Liown would no longer comply with the terms of the November 2013 settlement. (See Merrill Decl., Ex. 20, "Letter from Liown to David Baer" [Doc. No. 55-9].)

Liown's termination of its settlement with Luminara occurred a few days after United States Patent No. 8,789,986 ("the '986 patent") was issued. (See Third Am. Compl. ¶ 32 [Doc. No. 131].) The '986 patent is entitled "Electric Lighting Device and Method of Manufacturing Same." (See id.) It was issued to Mr. Xioafeng Li, and was assigned to Liown. (See id.) Plaintiff alleges that the '986 patent infringes the Artificial Flame Technology patents, including the '166 patent. Thus, Luminara and Liown appear to have dueling patents for similar technology.

### C.  Tortious Interference Claim

While Liown's sales of its flameless candles largely consisted of sales to non-Luminara customers in 2012, Liown's sales strategy allegedly changed in 2014.  (See Pl.'s Mem. at 10 [Doc. No. 52].)  According to Jerry Cain, the President of Luminara, in 2014, "Liown began aggressively offering infringing flameless candles for sale to customers who had previously purchased flameless candles from Luminara, or who were under contract to purchase flameless candles using the licensed Artificial Flame Technology exclusively from Luminara."  (Cain Decl. ¶ 3 [Doc. No. 53].)  Plaintiff claims that Defendant Boston Warehouse Trading Corp. ("Boston Warehouse") sold a "Forever Flame" Candle that was made by Liown and infringed on claim 1 of the '166 patent.  (See Pl.'s Mem. at 6 [Doc. No. 52].)  Luminara argues that, currently, Liown and Boston Warehouse are selling flameless candles called "Illuminaires," in "an obvious attempt to make a false affiliation with Luminara's successful brand and registered trademark."  (See id. at 10.)

Luminara's contracts with Defendant GKI/Bethlehem and Defendant The Light Garden, Inc. ("Light Garden") prohibit GKI/Bethlehem and Light Garden from purchasing for resale any products incorporating the Artificial Fame Technology, or products with confusingly similar technology, without Luminara's pre-approval.  (See Cain Decl. ¶ 5 (citing GKI/Bethlehem Distribution Agreement § 2.04) [Doc. No. 53]; Cain Decl., Ex. B "Light Garden Distribution Agreement" §§ 1.08, 2.01 [Doc. No. 53-1].)  Nonetheless, in November 2014, GKI/Bethlehem purchased flameless candles from Liown.  (See Cain Decl. ¶ 6 [Doc. No. 53].)  Plaintiff believes that GKI/Bethlehem may

continue purchasing additional candles from Liown in the future.  (See Merrill Decl. ¶ 3 [Doc. No. 55].)  In October 2014, Light Garden also began purchasing flameless candles from Liown.  (See Cain Decl. ¶ 7 [Doc. No. 53].)

Plaintiff requests that the Court issue a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(d)(2), ordering (1) Defendants to "cease manufacturing, distributing, selling or offering for sale infringing flame candles to Luminara's customers;" and (2) Defendants to "recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers."  (See Pl.'s Mem. at 13 [Doc. No. 52].)

## III.   DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted).  A district court must consider four factors in determining whether preliminary injunctive relief is warranted:  "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest."  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)); see Trebro Mfg. v. Firefly Equip., LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2014) (citing Winter, 555 U.S. at 20).  The burden of establishing the four Dataphase factors lies with the moving party.  Watkins Inc., 346 F.3d at 844 (citation omitted).  The United States Court of Appeals for the Federal Circuit explains that "a movant cannot be granted a preliminary injunction unless

it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and

irreparable harm."  See Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343,

1350 (Fed. Cir. 2001) (citing Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d

1084, 1088 (Fed. Cir. 1998)).  In analyzing all four factors, "'a court should flexibly

weigh the case's particular circumstances to determine whether the balance of equities so

favors the movant that justice requires the court to intervene.'"  Hubbard Feeds, Inc. v.

Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (quoting United Indus.

Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998)).[1]

## A.  Likelihood of Success on the Merits

While "no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113,

the likelihood of success factor is the most important, Barrett v. Claycomb, 705 F.3d 315,

320 (8th Cir. 2013) (citation omitted).  Therefore, in order to obtain a preliminary

injunction, the moving party must show that he has a "fair chance of prevailing" on his

claims.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir.

2008).  "[A]n injunction cannot issue if there is no chance of success on the merits."

Mid-Am. Real Estate Co. v. Iowa Realty Co., Inc., 406 F.3d 969, 972 (8th Cir. 2005)

(citations omitted).  However, the question is not whether the moving party has

"'prove[d] a greater than fifty per cent [sic] likelihood that he will prevail.'"  PCTV

---

[1]     The Court notes that although Luminara and Liown currently hold allegedly
dueling patents for moving flameless candles, the Court's preliminary injunction analysis
remains the same.  See C & A Plus, Inc. v. Pride Solutions, LLC, No. Civ. A3-02-118,
2003 WL 25278133, *6 (D. N.D. Feb. 7, 2003) (granting the plaintiff's motion for a
preliminary injunction, and explaining that the plaintiff demonstrated a likelihood of
success even though the defendant had a patent to sell its product); see also Amgen, Inc.
v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1205 (Fed. Cir. 1991) (same).

Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting Dataphase

Sys., Inc., 640 F.2d at 113).  Rather, the question is whether any of the movant's claims

provide "fair ground for litigation."  Watkins Inc., 346 F.3d at 844 (citation and internal

quotation marks omitted).

To satisfy the first Dataphase factor, Plaintiff must only demonstrate a likelihood

of success on the merits for one of its two claims, either its patent infringement claim, or

its tortious interference claim.  In order to establish a likelihood of success on its patent

infringement claim, Luminara must show a likelihood of success with respect to both (a)

Defendants' infringement of Plaintiff's patent, and (b) the validity of Plaintiff's patent.

See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1363 (Fed. Cir.

2001).

However, if Defendants present evidence which raises a "'substantial question'

concerning validity, enforceability, or infringement, [Plaintiff must] . . . produce

countervailing evidence demonstrating that these defenses 'lack[] substantial merit.'"

See id. (quoting Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir.

1997)); Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1377–78 (Fed. Cir.

2009) (explaining that if the alleged infringer challenges the validity of the movant's

patent, "it is the patentee, the movant, who must persuade the court that, despite the

challenge presented to validity, the patentee nevertheless is likely to succeed at trial on

the validity issue," because "the invalidity defense 'lacks substantial merit.'").  In the

Court's view, Luminara has demonstrated that it is likely to prevail with its patent

infringement claim.  As Luminara must show likelihood of success with respect to only

one of its claims, the Court does not address the likelihood of success of Plaintiff's

tortious interference claim.

### 1.   Claim Construction of Claim 1 of the '166 Patent

"The first step of the infringement analysis is claim construction."  Nazomi

Commc'ns, Inc. v. Nokia Corp., 739 F.3d 1339, 1343 (Fed. Cir. 2014) (citing Cybor

Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc)).  A court

begins its claim interpretation by examining intrinsic evidence, *i.e.*, the words and terms

of the claim, "the rest of the specification, and, if in evidence, the prosecution history."

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).  A court

"indulge[s] a 'heavy presumption' that a claim term carries its ordinary and customary

meaning."  See id. (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d

985, 989 (Fed. Cir. 1999)).

According to Federal Circuit precedent, a claim term's ordinary meaning may be

derived from dictionary definitions.  See, e.g., Rexnord Corp. v. Laitram Corp., 274 F.3d

1336, 1344 (Fed. Cir. 2001) (using Random House Unabridged Dictionary to define the

ordinary meaning of "portion" as encompassing both a one-piece and a two-piece

structure); Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed.

Cir. 1998) (noting that the meaning of a claim term may come from a "relevant

dictionary" so long as the definition does not fly "in the face of the patent disclosure");

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)

(explaining that "[a]lthough technical treatises and dictionaries fall within the category of

extrinsic evidence, as they do not form a part of an integrated patent document, they are

worthy of special note.  Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

"[I]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, [the Court] will generally construe the term to cover all known types of that structure" that the patent disclosure supports.  Renishaw, 158 F.3d at 1250.  A patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." Rexnord Corp., 274 F.3d at 1344 (citations omitted).

Only if the intrinsic evidence alone does not resolve any ambiguity in a disputed claim term, "[c]ourts may also use extrinsic evidence (*e.g.,* expert testimony, treatises) to resolve the scope and meaning of [the] claim term." CCS Fitness, Inc., 288 F.3d at 1366 (citing Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998); Kegel Co., Inc. v. AMF Bowling, Inc., 127 F.3d 1420, 1426 (Fed. Cir. 1997)).  However, "it is improper to rely on extrinsic evidence" if intrinsic evidence resolves all ambiguity. See Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1377 (Fed. Cir. 2005) (internal quotations and citation omitted).

Here, intrinsic evidence clarifies any ambiguity in the claim terms, and therefore, the Court need not look to any extrinsic evidence.  As the Court noted above, claim 1 provides as follows:

1. A pendulum member for generating a flickering flame effect, comprising:

a [1] **body** with upper and lower portions;

a [2] **flame silhouette** element extending outward from the upper portion of the body;

and [3] **a hole** in the body below the flame silhouette element, wherein the hole is configured to receive [4] **a flame support** element such that the flame support element passes through the hole and the body is free to pivot when supported by the flame support element.

(See Merrill Decl., Ex. 5, "'166 Patent," claim 1 (bold and bracketed numbering added) [Doc. No. 55-1].)

For the purposes of this motion only, Liown assumes that Luminara's proposed claim construction for each term is correct. (See Defs.' Mem. at 14 n.2 [Doc. No. 76].) Thus, the Court also accepts Luminara's proposed claim construction. Salient to the dispute in this case, Plaintiff proposes that the term "pivot" means "to run on, or as if on, a pivot." (See Pl.'s Mem. at 19 [Doc. No. 52].) Luminara explains that the specification shows the invention pivotally mounted in that it can sway, twist or move on the support wire in multiple dimensions. (See Merrill Decl., Ex. 5, "'166 Patent," Col. 3:27–37 [Doc. No. 55-1].) Moreover claim 14 states that "the flame body swings or pivots freely about the support element." (See id. at claim 14.)

Plaintiff also proposes that the term "body" means "a pendulum member to which a flame silhouette is *attached*." (See Pl.'s Mem. at 18 (emphasis added) [Doc. No. 52].) Additionally, Plaintiff proposes that the Court interpret the term "flame silhouette" to mean "a shaped material, *attached* to the flame body, on which light is projected from a light source and reflected off the surface of the silhouette." (See id. at 19) (emphasis

added).  Defendants accordingly argue that, under Plaintiff's own claim construction, the

"'body' and the 'flame silhouette' must be two separate pieces that are attached to each

other."  (See Defs.' Mem. at 14 [Doc. No. 76].)  Liown's primary basis for reading the

claim as requiring two separate components is Figure 1 in the specification of the '166

patent, which appears to depict the body and flame silhouette as two separate pieces.

(See Defs.' Mem. at 15 (citing Fig. 1 of the '166 Patent) [Doc. No. 76].)[2]

   Here, the parties dispute the role of Figure 1 in the specification in construing

claim 1.  Although claims must be read in view of the specification, see Markman v.

Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), limitations from

the specification should not be read into the claims, see Comark Commc'ns, Inc. v. Harris

Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).  See also Raytheon Co. v. Roper Corp., 724

F.2d 951, 957 (Fed. Cir. 1983) (explaining that simply because "claims are interpreted in

light of the specification does not mean that everything expressed in the specification

must be read into all the claims.").  In fact, the Federal Circuit held in Teleflex, Inc. v.

Ficosa North America Corp., that "the number of embodiments disclosed in the

specification is not determinative of the meaning of disputed claim terms."  See 299 F.3d

---

[2]      Defendants' expert, Kenneth W. Fernald, an engineer for Silicon Laboratories,
also relies upon the dictionary definition of "attach" in order to reach his conclusion that
the body and the flame silhouette must be two, detachable, separate pieces.  (See Fernald
Decl. ¶ 4 [Doc. No. 79].)  Mr. Fernald contends that according to Merriam-Webster
Dictionary, to "attach" means to "to fasten or join one thing to another."  (See Fernald
Decl., Ex. B [Doc. No. 79-2].)  Mr. Fernald fails to note, however, that Merriam-Webster
Dictionary also defines "attach" to mean "to be or become joined or connected," and/or
"to associate or connect one thing with another."  (See id.)  These additional definitions
support a construction of the term "attach," which includes an embodiment of the
invention in which the flame silhouette and body are permanently joined to one another,
or permanently connected to one another, without the need to fasten one part to the other.

1313, 1327 (Fed. Cir. 2002). "[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." See id. (citing CSS Fitness, 288 F.3d at 1366). Unless a patentee demonstrates intent to deviate from the plain meaning of a term by "using words or expressions of manifest exclusion or restriction," the Court must construe the claim term to take on its ordinary and accustomed meaning. See id.

In this case, nothing in the intrinsic evidence indicates that the body and flame silhouette must be two, detachable pieces. Therefore, the Court disagrees with Defendants' interpretation of claim 1 and construes claim 1 consistent with the plain and ordinary meaning of the terms used. Pursuant to the language in claim 1, the body, one separately defined component, may be attached to, but not *de*tachable from, the flame silhouette, another separately defined component.[3] Figure 1 of the specification describes only one embodiment of the claimed body and flame silhouette, but in the circumstances of this case, the record is devoid of "clear statements of scope" that define the body and the flame silhouette as two separate, detachable components. See id. Absent such clear statements of scope, the Court is constrained to follow the language of the claim, rather than the depiction in Figure 1. See SRI Intern v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985); Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n, 805

---

[3]     The Court recalls that during oral argument, Plaintiff's counsel provided a helpful analogy for understanding the attached, but not detachable concept. As counsel explained, a human arm is attached, but not detachable from an individual's torso or body.

F.2d 1558, 1563 (Fed. Cir. 1986) (cautioning "against limiting the claimed invention to preferred embodiments or specific examples in the specification.").

Moreover, the Court notes that Figure 11 in the specification depicts a unitary body and flame silhouette element.  (See Merrill Decl., Ex. 5 "'166 Patent," Fig. 11 [Doc. No. 55-1].)  Therefore, Defendants' reliance on the depiction in Figure 1 is further undermined by the depiction in Figure 11.  In sum, the Court rejects Defendants' construction requiring two detachable components, and construes claim 1 as encompassing an integrated structure that has both a body section and flame silhouette section.

### 2.  Liown's '986 Patent Infringes Claim 1 of '166 Patent

The next step in the Court's infringement analysis requires the Court to determine whether the particular accused device infringes under the claim construction.  See Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1443 (Fed. Cir. 1997).  "Literal infringement exists if each of the limitations of the asserted claim(s) read[s] on, that is, [is] found in, the accused device."  Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1583 (Fed. Cir. 1995), cert. denied, 516 U.S. 906 (1995).  "Infringement may be found under the doctrine of equivalents when, absent estoppel, every limitation of the asserted claim, or its equivalent, is found in the accused subject matter, the latter differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result."  Wright Med. Tech., Inc., 122 F.3d at 1444 (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 39–40 (1979); Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339

U.S. 605, 608–09 (1950)).

Plaintiff contends that Liown's flameless candles utilize every aspect of claim 1 of the '166 patent, and therefore, Liown's candles literally infringe claim 1. (See Pl.'s Mem. at 20 [Doc. No. 52].)  In opposition, Defendants argue that the Liown candles do not infringe because (1) unlike the '166 patent, Liown's candles incorporate an "integrated flame silhouette/body structure, rather than a separate flame silhouette attached to a body," and (2) they do not include a hole in the body below the flame silhouette element.  (See Defs.' Mem. at 13–17 [Doc. No. 76].)  The Court disagrees with both of Defendants' arguments.

First, contrary to Defendants' argument, the '166 patent does not require the "flame silhouette" to be a separate, detachable piece from the "body."  (Cf. id. at 14.)   As the Court noted above, it construes claim 1 as not requiring two separate, detachable pieces for the body and the flame silhouette.  See supra Part III(A)(1).  Simply because Luminara describes a portion of the structure, "the body," as attached to another portion of the structure, "the flame silhouette," does not mean that the portions must be detachable components.  Rather, the body and flame silhouette may be separately defined parts of a single, unitary structure.  Therefore, even though Liown's accused products "comprise an integrated flame silhouette/body structure," this integrated, unitary structure does not differ from the structure described in claim 1.  (Cf. Defs.' Mem. at 14 [Doc. No. 76].)

Second, contrary to Defendants' argument, Liown's accused products do in fact include a hole in the body below the flame silhouette.  (Cf. id. at 16.)  Defendants' expert,

Mr. Fernald, contends that in Liown's candles the hole runs "through the upper flame-shaped portion of the unified structure, rather than running through a 'body' located below an attached flame silhouette element."  (See Fernald Decl. ¶ 7 [Doc. No. 79].)  The Court disagrees with Mr. Fernald's and Defendants' characterization of the distinction between the locations of the holes in the two products.  Both products have a hole located below the flame-shaped structure, as is evidenced by the illustration that Mr. Fernald relies upon in his declaration.  (See Fernald Decl. at 4 [Doc. No. 79].)

It is immaterial that Liown characterizes the hole as located in "the upper flame-shaped portion of the unified structure," and Luminara characterizes the hole as located "in the body below the flame silhouette element," because both definitions permit for the same interpretation.  Defendants do not dispute Luminara's proposed construction that (1) the "body" is the "pendulum member to which a flame silhouette is attached;" and (2) the "flame silhouette" is the "flame shaped material, attached to the flame body, on which light is projected."  (See Pl.'s Mem. at 18–19 [Doc. No. 52]; Defs.' Mem. at 14 n.2 [Doc. No. 76].)  Accordingly, Defendants must necessarily accept that the hole in Luminara's products is also in the upper-flame shaped portion of the structure.  Simply because Liown argues that its candles use a "unified" body/flame silhouette structure does not distinguish it from Luminara's candles, because, as the Court explained above, claim 1 of the '166 patent includes candles that have a unified, or integrated body/flame silhouette structure.

The Court finds that patent infringement is likely, despite the fact that the United States Patent and Trademark Office ("USPTO") granted Mr. Li a patent for a moving

flameless candle, and considered one of Disney's prior patents for Artificial Flame Technology.  Although the '166 patent was not listed in the References Cited section of Mr. Li's '986 patent, the '355 patent, one of Disney's other Artificial Flame Technology patents, was considered by the USPTO examiner.  (See Merrill Decl., Ex. 19 "'986 patent," References Cited [Doc. No. 55-9].)  In addition to the '355 patent, the examiner also considered Disney's September 30, 2008 provisional application, which served as the basis for all four of Disney's Artificial Flame Technology patents.  (See id., Other Publications.)

Generally, the USPTO is entitled "'the deference that is due to a qualified government agency presumed to have properly done its job.'"  See PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting Am. Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).  In this case, however, the Court disagrees with the USPTO's decision to grant Mr. Li's patent.  Although the examiner considered the '355 patent and the September 30, 2008 provisional patent application,[4] the Court disagrees with the USPTO because of the Court's underlying claim construction of claim 1 of the '166 patent.  Here, the Court construed claim 1 of the

---

[4]    While a provisional patent application does not grant patent rights, according to 35 U.S.C. § 119 (e)(1), if a non-provisional patent application is filed no later than twelve months after the date on which the provisional application was filed and if it contains a specific reference to the provisional application, then the non-provisional application may claim the benefit of the provisional application's earlier filing date.  See 35 U.S.C. § 119(e)(1).  Here, Disney filed its '355 patent, its first non-provisional patent application based on the 2008 provisional application, on July 21, 2009, and the patent issued on November 23, 2010.  (See Merrill Decl., Ex. 2 "'355 patent" [Doc. No. 55-1].)  Thus, because the '355 patent was filed less than one year after the provisional application was filed, the '355 patent is entitled to the benefit of the 2008 filing date.

'166 patent as including an embodiment of the patent that had a unitary body and flame silhouette element.  As Plaintiff explains, claim 1 of the '166 patent is based on the earlier-filed September 30, 2008 provisional application.  (See Pl.'s Mem. at 5 (citing Patton Decl. ¶ 6) [Doc. No. 52].)  Therefore, the Court's construction of claim 1 of the '166 patent transfers to construing the claims of the 2008 provisional application. Accordingly, the 2008 provisional application also covers an embodiment of the technology that includes a unitary body and flame silhouette element.  (See Merrill Decl., Ex. 7 "Provisional Application 61/101,611" [Doc. No. 55-1].)

Based on the Court's claim construction, the Court concluded above that the '986 patent likely infringes claim 1 of the '166 patent.  Thus, in this case, the Court's claim construction is at odds with the USPTO's determination, and the Court does not defer to the agency's decision.  See C & A Plus, Inc. v. Pride Solutions, LLC, 2003 WL 25278133, *6 (D. N.D. Feb. 7, 2003) (granting the plaintiff's motion for a preliminary injunction, and explaining that the plaintiff demonstrated a likelihood of success even though the defendant had a patent to sell its product); see also Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1205 (Fed. Cir. 1991) (same).

In sum, the Court finds that Luminara demonstrated a substantial likelihood that Liown infringed the '166 patent and Defendants failed to raise a substantial question about whether the '986 patent infringes claim 1.  See Purdue Pharma L.P., 237 F.3d at 1365 (holding that the accused product infringes under the court's claim construction, and the district court did not err in finding that the plaintiff made a "strong showing of a reasonable likelihood that it would succeed on the merits of its infringement claim.").

### 3.  No Substantial Question of Validity of Luminara's '166 Patent

In addition to arguing that a substantial question exists as to whether the '986 patent infringes claim 1, Defendants also argue that a substantial question exists as to the validity of the '166 patent.  "[T]he alleged infringer at the preliminary injunction stage does not need to prove invalidity by the 'clear and convincing' standard that will be imposed at trial on the merits."  See Titan Tire Corp., 566 F.3d at 1379.  Rather, the Court "must decide whether to grant a preliminary injunction in light of the burdens the parties will bear at trial."  See id.

In Oakley, Inc. v. Sunglass Hut Int'l, the Federal Circuit explained that "[i]n the context of a preliminary injunction, while 'the burden of proving invalidity is with the party attacking validity,' the party seeking the injunction 'retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail.'"  See 316 F.3d 1331, 1339 (Fed. Cir. 2003) (quoting H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 387 (Fed. Cir. 1987)).  Therefore, Luminara must show that an attack on its patent's validity would likely fail.

However, if Defendants raise "a substantial question concerning infringement or validity, meaning that [they] assert[] a defense that [Luminara] cannot prove lacks substantial merit," the Court should not issue the preliminary injunction.  Tate Access Floors v. Interface Architectural Resources, 279 F.3d 1357, 1365 (Fed. Cir. 2002) (internal quotation marks omitted); see New Eng. Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed. Cir. 1992) (explaining that "[w]hile it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks

21

substantial merit").  Here, Defendants argue that claim 1 of the '166 patent is invalid because (a) it was anticipated by the '455 patent to Gary Schnuckle, a co-inventor of the '166 patent; and/or (b) it is invalid as obvious under 35 U.S.C. § 103(a).  The Court addresses both arguments below.

### a.  Luminara's '166 Patent Not Anticipated by '455 Patent

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."  Verdegaal Bros., Inc. v. Union Oil Co. of Cal., 814 F.2d 628, 631 (Fed. Cir. 1987) (internal citations omitted); see also Liberty Ammunition, Inc. v. United States, 119 Fed. Cl. 368, 392–93 (Fed. Cir. 2014); Schering Corp. v. Geneva Pharm., 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Accordingly, Defendants must raise a substantial question that prior art anticipated every element of claim 1.

Here, Defendants contend that the '455 patent constitutes prior art and anticipated claim 1 of the '166 patent.  Specifically, Defendants argue that, under 35 U.S.C. § 102(b), the '455 patent is prior art to the '166 patent because the '455 patent shares one common inventor with the '166 patent, and was issued more than a year before the purported priority date of the '166 patent. [5]  (See Defs.' Mem. at 18 [Doc. No. 76].)  Plaintiff does not take issue with Defendants' assertion that the '455 patent constitutes prior art, under the definition provided by 35 U.S.C. § 102. [6]  Rather, Plaintiff contends that although the

---

[5]    The definition of prior art, and exceptions to the definition are outlined in 35 U.S.C. § 102.  See 35 U.S.C. § 102(a), (b).

[6]    As Plaintiff does not disagree that the '455 patent constitutes prior art, the Court assumes that the '455 patent satisfies the definition of prior art pursuant to 35 U.S.C. §

'455 patent is prior art, it does not anticipate claim 1 because each and every element of claim 1 is not found, either expressly or inherently, in the '455 patent.  (See Pl.'s Reply at 8–11 [Doc. No. 101].)  While Defendants rely on a declaration from their expert, Mr. Fernald, Plaintiff relies on the declaration of its expert, Stuart Brown, the Managing Principal and co-founder of Veryst Engineering, LLC.  (See generally Brown Decl. [Doc. No. 102].)

The Court agrees with Luminara and finds that Defendants fail to raise a substantial question that the '455 patent anticipates claim 1 of the '166 patent because it does not contain all of the required elements.  See Verdegaal Bros., Inc., 814 F.2d at 631. Specifically, the '455 patent does not anticipate the final element of claim 1 – "a flame support element such that the flame support element passes through the hole and body is free to *pivot* when supported by the flame element."  (See Miller Decl., Ex. 5 "'166 Patent," claim 1 (emphasis added) [Doc. No. 55-1].)

According to the other claims in the '166 patent and the specification, the pendulum pivots by moving in a "chaotic" motion, which creates the realistic "flickering flame effect" required by claim 1.  (See id.; id. at Col. 2:24–27.)  For instance, claim 14 states that "the flame body swings or pivots freely about the support element."  (See id. at claim 14.)  Both parties agree that the term "pivot" means "to run on, or as if on, a pivot." (See Pl.'s Mem. at 19 [Doc. No. 52].)  Additionally, the specification clarifies that "[t]he chaotic motion is possible because each pendulum is suspended using a V-shaped wire passing through a larger hole."  (See Brown Decl. ¶ 8 [Doc. No. 102]; see also Merrill

102.

Decl., Ex. 5, "'166 Patent," Col. 8:7–16 ("Hole in pendulum member is sufficiently larger than the diameter of support wire such that pendulum swing or pivots freely about support wire . . . In this manner, pendulum member is able to move back and forth . . . as well as flutter.") [Doc. No. 55-1].)  Plaintiff's expert, Mr. Brown, explains that the "relatively loose suspension allows the pendulum to rotate around three axes, slide along the wire, and translate the pendulum where it passes through the wire."  (See Brown Decl. ¶ 8 [Doc. No. 102].)  Therefore, the pendulum in the '166 patent moves in at least four different ways, and moves in a random, unpredictable manner, "much like a candle flame."  (See id. ¶ 9.)

While the pendulum described in claim 1 of the '166 patent moves chaotically, in at least four different directions, the pendulum described in the '455 patent moves rhythmically, in only two directions.  According to claim 1 of the '455 patent, the "simulated flame portion [has] a longitudinal axis . . . [and] said flame portion is movable toward and away from its longitudinal axis when subjected to air currents."  (See Poley Decl., Ex. 2 "'455 Patent," claim 1 [Doc. No. 78-2].)  The '455 patent describes this design as a "gimbal structure."  (See id. at Col. 3:55–62.)  The specification states that "[t]he movement of the magnetic base towards or away from the electromagnets will induce a rotational motion of the gimbal structure about the horizontal (or vertical) plane."  (See id. at Col. 6:4–7.)

Mr. Brown explains that "[u]nlike the invention in claim 1 of the '166 patent, the gimbal mechanism described in the '455 patent is unable to 'pivot' in three dimensions; the gimbal is limited to two rotations around two horizontal axes."  (See Brown Decl. ¶

13 [Doc. No. 102].)  The '455 patent gimbal mechanism "cannot 'twist' like the pendulum member in claim 1 of the '166 patent, and, therefore, is not 'free to pivot when supported by the flame support element.'"  (See id.)

In contrast, Defendants claim that that the gimbal mechanism in the '455 patent moves in the same way as the pivoting system described in the '166 patent.  (See Defs.' Mem. at 21 [Doc. No. 76].)  The Court disagrees.  Defendants state that according to the specification of the '455 patent, the rotation of the gimbal mechanism allows the flame shaped element to be displaced from its stationary position to other positions illustrated in Figures 4 and 6 in the '455 patent.  (See id.)  However, upon close inspection of Figures 4 and 6, it is evident that the illustrations demonstrate that the flame shaped element only moves in two different directions, toward and away from the longitudinal or vertical axis.  (See Poley Decl., Ex. 2 "'455 Patent," Figs. 4, 6 [Doc. No. 78-2].)[7]  This limited movement is in stark contrast to the "pivot," or freely chaotic pendulum movement that is required by claim 1 of the '166 patent.  Therefore, the Court finds that the '455 patent does not anticipate at least one element of claim 1 of the '166 patent.  See Purdue Pharma L.P., 237 F.3d at 1366.

The Court's holding is bolstered by the fact that the '455 patent was specifically

---

[7]     The Court notes that it is not limiting the '455 patent to "preferred embodiments or specific examples in the specification."  See Comark, 156 F.3d at 1186.  Rather, here the Court's interpretation is based on a holistic reading of the specification and the illustrations, which demonstrate that the gimbal mechanism and its two-dimensional rotation of the artificial flame is a core concept on the claimed design of the patented product.  See SRI Intern., 775 F.2d at 1121; (see, e.g., Poley Decl., Ex. 2. "'455 Patent," Col. 3:55–62; 4:17–18, 27–32; 5:1–9, 33–38; 6:4–7, 58–61 (describing the consistent function and purpose of the gimbal mechanism in different embodiments) [Doc. No. 78-2]).

considered by the USPTO during examination of the '166 patent.  (See Pl.'s Reply at 11

[Doc. No. 101]; Merrill Decl., Ex. 5, "'166 Patent," References Cited [Doc. No. 55-1].)

In PowerOasis, the Federal Circuit held that "'[w]hen no prior art other than that which

was considered by the [US]PTO examiner is relied on by the attacker, [the attacker] has

the added burden of overcoming the deference that is due to a qualified government

agency presumed to have properly done its job.'"  See 522 F.3d at 1304 (quoting Am.

Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1359 (Fed. Cir. 1984)); see also

Tokai Corp. v. Easton Enterprises, Inc., 632 F.3d 1358, 1367 (Fed. Cir. 2011).

Here, Liown, the party attacking the validity of the '166 patent, relies solely on the

'455 patent.  Although Liown must only raise a substantial question as to the validity of

the '166 patent at this stage in the proceedings, the Court bears in mind the deference that

the USPTO is due.  Given the Court's analysis of the two patents and the fact that the

USPTO examiner considered the '455 patent in its list of references when determining

whether to grant the '166 patent, Liown's argument about the invalidity of the '166

patent lacks substantial merit.  See Purdue Pharma L.P., 237 F.3d at 1363.  Accordingly,

the Court holds that Liown failed to raise a substantial question concerning the validity of

the '166 patent, because at least one element of claim 1 was *not* anticipated by the '455

patent.[8]

---

[8]     Luminara also argues that the '455 patent did not anticipate another element of
claim 1.  Specifically, Plaintiff contends that the hole in the '455 patent serves a different
purpose than the hole discussed in claim 1 of the '166 patent.  (See Pl.'s Reply at 11
[Doc. No. 101].)  The hole in claim 1 of the '166 patent serves as the location from which
the pendulum pivots.  (See id.)  The gimbal mechanism in the '455 patent, however,
pivots not at the hole in the body, but, instead, around points connecting the rod to the

### b. Luminara's '166 Patent Not Obvious Because of '455 Patent

Defendants also argue that "[e]ven if [c]laim 1 was not found to be anticipated, it would still be invalid as 'obvious' under 35 U.S.C. § 103(a)." (See Defs.' Mem. at 22 [Doc. No. 76].)  Under § 103, a patent may not issue "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." See 35 U.S.C. § 103.

"Obviousness is a question of law based on underlying factual determinations, including: (1) the scope and content of prior art; (2) differences between prior art and claims; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness." PAR Pharm., Inc. v. TWI Pharm., Inc., 773 F.3d 1186, 1193 (Fed. Cir. 2014) (citing Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)).  At trial, Liown will be required to demonstrate "by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention[, or the elements of claim 1 of the '166 patent], and that the skilled artisan would have had a reasonable expectation of success from doing so." Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009)); see also Microsoft

---

ring-shaped member and on the housing of the flameless candle.  (See id.) (citing Brown Decl. ¶ 14 [Doc. No. 102].)  Therefore, Luminara argues that although both patents refer to a hole in the "body," the holes serve different purposes.  Because the Court has already held that the '455 patent did not anticipate the "pivoting" required by claim 1, it need not determine the merits of Plaintiff's argument about the purpose of the "hole" in the "body."

Corp. v. i4i Ltd. P'ship, _U.S._, 131 S. Ct. 2238, 2242 (2011) (confirming that an invalidity defense must meet the clear-and-convincing evidence standard of proof); In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (same).

At this stage of the proceedings, however, Defendants need not satisfy the "clear and convincing" evidence standard.  Rather, when deciding whether to grant the preliminary injunction, the Court simply keeps in mind the burden Liown will ultimately face.  See Titan Tire Corp., 566 F.3d at 1379.  The Court's obviousness inquiry "must be expansive and flexible."  In re Cyclobenzaprine, 676 F.3d at 1068 (citing KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 415, 419 (2007)).

Here, Liown claims that "[o]ne skilled in the art of flameless candles would certainly find the overbroad [c]laim 1 invalid in view of the '455 [p]atent."  (See Defs.' Mem. at 22 [Doc. No. 76].)  The Court begins its obviousness analysis by ascertaining the differences between (1) the prior art, the '455 patent, and (2) the claim at issue, claim 1 of the '166 patent.  See PAR Pharm., Inc., 773 F.3d at 1193.  As the Court explained in detail above, the "pivoting" required by claim 1 was not anticipated by the '455 patent because that prior art utilizes a gimbal mechanism, which enables the flame silhouette to only move in a limited, controlled fashion, as opposed to moving in a three-dimensional, chaotic fashion.  See supra Section III(A)(3)(a); (Brown Decl. ¶ 13 [Doc. No. 102]).  Based on this significant difference between the prior art and the claim at issue, Graham, 383 U.S. at 17–18, the Court finds that Defendants failed to raise a substantial question as to whether claim 1 is invalid as obvious because of prior art.  See Procter, 566 F.3d at

28

994.

In sum, Luminara established a substantial likelihood of success on the merits of its patent infringement claim, and Defendants failed to raise substantial doubt about the validity of the '166 patent, and about whether the '986 patent infringes claim 1.  See Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1168 (Fed. Cir. 2014) (reversing district court's denial of preliminary injunction because the district court erroneously construed the terms of the movant's patent, and holding that the movant "established that it [was] 'more likely than not' to succeed on infringement," and finding that there was no substantial question as to the movant's patent's validity).  The Court need not discuss the likelihood of success of Luminara's tortious interference claim because Luminara must only establish substantial likelihood of success for one of its claims in order for a preliminary injunction to issue.

### B.  Risk of Irreparable Harm

Although the likelihood of success is the most important factor, Barrett, 705 F.3d at 320, the Court also considers the other three Dataphase factors to determine whether a preliminary injunction should issue.  The Court presently considers the threat of irreparable harm to Luminara in the absence of relief.  See Watkins Inc., 346 F.3d at 844 (citing Dataphase Sys., Inc., 640 F.2d at 114)).  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  Gen. Motors Corp. v. Harry Brown's LLC, 563 F.3d

312, 319 (8th Cir. 2009).[9]  An injunction may only issue if the irreparable injury is

"imminent."  See ASICS Corp. v. Target Corp., 282 F. Supp. 2d 1020, 1031 (D. Minn.

2003) (citing In re Travel Agency Com'n Antitrust Litig., 898 F. Supp. 685, 689 (D.

Minn. 1995) (stating that "an injunction cannot issue based on imagined consequences of

an alleged wrong.  Instead, there must be a showing of imminent irreparable injury.")).

     Plaintiff argues that it will suffer immediate, irreparable harm because without a

preliminary injunction Luminara will (1) lose its market share; (2) lose goodwill and

suffer harm to its reputation; (3) suffer from price erosion; and (4) lose customers and

sales to its direct competitor, Liown.  (See Pl.'s Mem. at 30–33 [Doc. No. 52].)

Defendants contend that Luminara will not suffer irreparable harm absent an injunction

because Plaintiff alleges nothing more than "the possibility of future harm," which is

entirely compensable by money damages.  (See Defs.' Mem. at 26 [Doc. No. 76].)

---

[9]    The Court notes that Defendants correctly assert that "[u]nder the current law, patentees who demonstrate a reasonable likelihood of success on the merits are no longer entitled to a presumption of irreparable harm in a preliminary injunction analysis."  (See Defs.' Mem. at 26–27 [Doc. No. 76].)  As another court in this District explained, "[i]n light of the Supreme Court's decision in eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006) . . . the Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction."  See Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd., 491 F. Supp. 2d 871, 881 (D. Minn. 2007).  Defendants argue that since eBay invalidated the presumption of irreparable harm, all cases that Plaintiff relies upon, which predate eBay, should be disregarded.  (See Defs.' Mem. at 27 [Doc. No. 76].)  The Court disagrees.  As Luminara explains, it cited cases, which predate eBay, for propositions that remain good law.  (See Pl.'s Reply at 4 [Doc. No. 101].)  Therefore, the Court cites to cases that Plaintiff relies upon as needed throughout this Order.

### 1. Loss of Market Share

Plaintiff contends that, without preliminary injunctive relief, it will suffer irreparable harm from losing its significant market position.  (See Pl.'s Mem. at 31 [Doc. No. 52].)  "[L]ost market share must be proven (or at least substantiated with some evidence) in order for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions 'in every patent case where the patentee practices the invention.'"  Automated Merch. Sys., Inc. v. Crane Co., 357 Fed. App'x 297, 301 (Fed. Cir. 2009) (quoting Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991)).  In Automated Merchandising Systems, the Federal Circuit noted that, in some circumstances, a non-compensable loss may include the loss of even a single distributor.  Cf. id. (holding that although loss of a single distributor may amount to an irreparable injury in some cases, in this case, "the defection of a single distributor from the patentee's camp to the accused infringer's camp" was insufficient to demonstrate irreparable harm).  Thus, Luminara must present at least some evidence demonstrating that its "potential losses cannot be compensated by monetary damages."  See id.

Luminara argues that it will not have the same opportunity to recapture its market share once the market matures.  (See Pl.'s Mem. at 31 [Doc. No. 52].)  Specifically, according to Jerry Cain, the President of Luminara, Liown's sales of its allegedly infringing candles will cause a significant decrease in Luminara's "market share value." (See Cain Decl. ¶ 12 [Doc. No. 53].)  In his declaration, Mr. Cain stated that in 2013, "GKI/Bethlehem accounted for over 40% of Luminara sales."  (See id. ¶ 4.)  Plaintiff

then implies that because GKI/Bethlehem re-directed its business from Luminara to

Liown, Luminara's percentage of sales from GKI/Bethlehem has necessarily also

decreased.[10]  (See Pl.'s Mem. at 31 [Doc. No. 52].)  Although Plaintiff presents evidence

demonstrating Luminara's percentage of sales to GKI/Bethlehem before Liown allegedly

began infringing, Plaintiff fails to provide any evidence demonstrating its market share of

the overall market of flameless candles that it had before and/or after the alleged

infringement began.  Therefore, Luminara does not make a "prima facie showing of lost

market share."  Cf. Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1154 (Fed.

Cir. 2011) (explaining that the plaintiff successfully made a prima facie showing of lost

market share through indirect evidence because it presented evidence showing that the

Wal-Mart account, which the plaintiff had before Wal-Mart redirected its business to the

defendant, accounted for a substantial portion of the entire market).

Luminara appears to argue that because there are no other non-infringing

alternatives for consumers to purchase flameless candles, Liown's continued sale of

allegedly infringing candles will unavoidably decrease Luminara's overall market share.

(See Pl.'s Mem. at 31 [Doc. No. 52].)  Defendants disagree, and argue that "[t]here are

several other flameless candle makers on the market which GKI/Bethlehem and The

---

[10]     The Court notes that according to Defendants, GKI only purchased *non*-moving
flame candles from Liown "when Liown began working with GKI."  (See Yang Decl. ¶ 9
[Doc. No. 80].)  Liown CEO, John Yang, does admit however that by the end of 2014,
Liown sold moving flameless candles to GKI.  (See id.)  Yang's concession aligns with
Luminara's contention that in November 2014 (the end of 2014), Luminara learned that
GKI may have been purchasing infringing candles from Liown.  (See Cain Decl. ¶ 6
[Doc. No. 53].)  Therefore, Defendants' argument that GKI/Bethlehem did not purchase
moving flameless candles until the end of 2014 is inapposite.

Light Garden could have sought flameless candles from other than Liown." (<u>See</u> Defs.'

Mem. at 29 [Doc. No. 76].) However, neither party substantiates their claims with any

corroborating evidence. As "lost market share must be proven (or at least substantiated

with some evidence) in order for it to support entry of a preliminary injunction,"

<u>Automated Merch. Sys., Inc.</u>, 357 Fed. App'x at 301, the Court accordingly finds that, in

this case, Luminara does not sufficiently establish that it would suffer irreparable harm

from lost market share.

### 2. Loss of Goodwill and Harmed Reputation

In addition to alleging irreparable harm in the form of lost market share, Luminara

also claims that without a preliminary injunction it will suffer irreparable loss of goodwill

and a harmed reputation. (<u>See</u> Pl.'s Mem. at 32 [Doc. No. 52].) Plaintiff's argument is

two-fold, as it contends that (1) Liown's alleged infringement renders Luminara's

exclusive license of Disney's Artificial Flame Technology a waste; and (2) Liown's

branding of its "Illuminaires" flameless candles essentially infringes Plaintiff's

"LUMINARA" trademark; and therefore, harms Plaintiff's reputation by associating

Luminara's product in customers' minds with Liown's allegedly inferior product. (<u>See</u>

<u>id.</u>) Luminara argues that "[a]bsent an injunction, there is nothing to stop Liown from

similarly marketing in the future and further diminishing the reputation of Luminara

candles by associating them in the minds of customers with Liown's inferior product."

(<u>See</u> <u>id.</u>)

The Federal Circuit and United States Court of Appeals for the Eighth Circuit

have both held that loss of goodwill and injury to reputation often constitutes irreparable

harm.  See Iowa Utils. Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996) (explaining that

"potential loss of consumer goodwill qualifies as irreparable harm."); Bio-Technology

Gen. Corp. v. Genentech, Inc., 80 F.3d 1553, 1566 (Fed. Cir. 1996) (finding that loss of

revenue and goodwill constitute irreparable harm); EZ Gard Indus., Inc. v. XO Athletic

Co., No. 07-cv-4769 (JMR/FLN), 2008 WL 1827490, at *4 (D. Minn. Apr. 23, 2008)

aff'd, 302 Fed. App'x 920 (Fed. Cir. 2008) (finding that the plaintiff will likely suffer

irreparable harm absent an injunction because the defendant was marketing to the

plaintiff's customer and "touting" its product as the "superior product," and "thus

impairing plaintiff's goodwill and reputation.").  Loss of goodwill and reputation qualify

as irreparable harm because monetary damages are inadequate to compensate a plaintiff

injured in this manner.  See Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d

801, 805 (8th Cir. 2003) (stating that "[h]arm to reputation and goodwill is difficult, if not

impossible, to quantify in terms of dollars.").

 Loss of consumer goodwill qualifies as irreparable harm, "[e]ven absent consumer

confusion," because a patentee's "reputation as an innovator" could "certainly be

damaged if customers found the same 'innovations' appearing in competitors'

[products]."  See Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336, 1344–

45 (Fed. Cir. 2013) (holding that the plaintiff submitted enough evidence to establish

irreparable harm because, among other things, the plaintiff showed that its reputation as

an innovator would certainly be damaged if "customers found the same innovations

appearing in competitors' snowplows, particularly products considered less prestigious

and innovative.").  As the Federal Circuit explained in Douglas Dynamics, LLC,

"[w]here two companies are in competition against one another, the patentee suffers the harm [to its reputation] – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." See id. at 1345.

Here, Luminara alleges that Liown's alleged infringement harms Luminara's reputation as the exclusive licensee of Disney's Artificial Flame Technology. (See Pl.'s Mem. at 32 [Doc. No. 52].) Luminara also has the sole and exclusive right to enforce Disney's Artificial Flame Technology patents. (See 4/3/15 Order at 7, 49–50 [Doc. No. 143].) Therefore, when Luminara sues to enforce these patents, as it does in this case, Luminara not only protects its own reputation as the exclusive licensee of the products, but it also protects Disney's reputation as an innovator.

As to Luminara's own reputation, it argues that it would be irreparably "damaged if its dealers and distributors believed it did not enforce its intellectual property rights." See Douglas Dynamics, LLC, 717 F.3d at 1345. Assuming Plaintiff's allegations about Defendants' patent infringement are correct, Luminara suffers irreparable harm to its reputation and goodwill by "being forced to compete against products that incorporate and infringe its own [products]." See id.

As to Disney's reputation, Liown's alleged infringement could certainly damage Disney's reputation as an "innovator" if customers found the same innovations appearing in both Disney's and Liown's products. See id. at 1344–45. Here, Disney's reputation is injured because with Liown's products on the market, Disney is no longer the sole innovator known for the Artificial Flame Technology. Because a patent is a property right that "is an intangible asset that is part of a company's reputation," Disney's

35

reputation as an innovator, and Luminara's exclusive right to make, use, and sell the

Artificial Flame Technology, are both harmed by Liown's alleged infringement.  See id.

at 1345.  Therefore, Plaintiff has presented evidence of loss of goodwill, which

establishes irreparable harm.

The Court's holding is bolstered by the fact that, as Plaintiff alleges, Liown's

marketing of its flameless candles essentially infringes Plaintiff's "LUMINARA"

trademark, and further harms Plaintiff's reputation by associating Luminara's product in

customers' minds with Liown's allegedly inferior product.[11]  (See Pl.'s Mem. at 32 [Doc.

No. 52].)  While Plaintiff alleges that Liown's candles are inferior to Luminara's candles

(see Pl.'s Mem. at 32 [Doc. No. 52]), this allegation is based solely on the Luminara

President's assertion of this alleged fact, and the President's contention that customers

and consumers "generally agree" with him (see Cain. Decl. ¶ 11 [Doc. No. 53]).  In

response, the CEO of Liown contends that Liown's products are superior to Luminara's,

because "on information and belief, Luminara's manufacturers source materials . . . do

not have a Material Safety Data Sheet and/or [do not] meet certification standards."  (See

Yang Decl. ¶ 6–7 [Doc. No. 80].)  The Court is cautious to credit either party's non-

expert, self-serving evidence regarding the superiority of either product.

---

[11]     Defendants argue that Liown's "Illuminaires" candles cannot create trademark
confusion with Plaintiff's "LUMINARA" candles because "[a] simple search for
trademarks associated with candles containing a variation of 'illuminate' or 'lumen'
reveals many hits."  (See Defs.' Mem. at 29 [Doc. No. 76].)  The Court notes, however,
that none of the "many hits," which Defendants reference, are flameless moving candle
products.  (See Poley Decl., Ex. 4 [Doc. No. 78-4].)  Therefore, product confusion
between Plaintiff's and Liown's candles is much more likely than product confusion with
other products.

However, even assuming that Liown's product is superior to Luminara's, because Liown chose to name its candles "Illuminaries," consumers could plausibly confuse Liown's product with the "LUMINARA" branded product.  See Douglas Dynamics, LLC, 717 F.3d at 1344; Medicine Shoppe Int'l, Inc., 336 F.3d at 805 (finding irreparable harm because the plaintiff had presented sufficient evidence to show that de-identification of the plaintiff's pharmacy created consumer confusion and eroded consumer confidence).  Similar to Disney's patents for Artificial Flame Technology, Plaintiff's "LUMINARA" trademark "represent[s] intangible assets of goodwill and reputation."  See 3M Co. v. Mohan, No. 09-cv-1413 (ADM/FLN), 2010 WL 5095676, at *24 (D. Minn. Nov. 24, 2010) aff'd, 482 Fed. App'x 574 (Fed. Cir. 2012) (citing Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987); Roederer v. J. Garcia Carrion, S.A., 732 F. Supp. 2d 836, 881 (D. Minn. 2010)).  Therefore, regardless of the quality of Liown's product compared to Luminara's product, Luminara incurs irreparable harm because its reputation is harmed by this confusion.  See Mohan, 2010 WL 5095676, at *24 (explaining that regardless of the quality of the defendant's product compared to the plaintiff's product, the defendant's "incursion on the reputation of the [plaintiff's] brand has caused irreparable injury.") (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195–96 (3d Cir. 1990) (stating that "[i]f another uses [the plaintiff's mark], he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use.")).  Accordingly, although Plaintiff's motion for a preliminary injunction does not rest on its likelihood of success on the merits for trademark

37

infringement, the Court's finding of irreparable harm is bolstered by the fact that Liown

chose to market its moving flameless candles with a brand name that is substantially

similar to Luminara's.[12]

### 3.   Price Erosion

Plaintiff also argues that "without preliminary injunctive relief, [it] will be forced

to reduce the price of its flameless candles to offset competition from Liown."  (See Pl.'s

Mem. at 33 [Doc. No. 52].)  In order for price erosion to serve as a basis of irreparable

harm, Luminara must present some substantive evidence demonstrating that price erosion

will occur.  See Purdue Pharma L.P., 237 F.3d at 1368 (holding that the district court

properly credited the plaintiff's economics expert testimony that price erosion was likely,

and therefore upholding the district court's finding of irreparable harm).  The Federal

Circuit explained in Polymer Technologies, Inc. v. Bridwell that:

> Competitors change the marketplace. Years after infringement has begun, it
> may be impossible to restore a patentee's (or an exclusive licensee's)
> exclusive position by an award of damages and a permanent injunction.
> Customers may have established relationships with infringers.  The market
> is rarely the same when a market of multiple sellers is suddenly converted
> to one with a single seller by legal fiat.  Requiring purchasers to pay higher
> prices after years of paying lower prices to infringers is not a reliable
> business option.

See 103 F.3d 970, 975–76 (Fed. Cir. 1996).  Therefore, according to Federal Circuit case

law, price erosion may inflict irreparable harm when it is not compensable with money

---

[12]     Insofar as Defendants argue that "Luminara's candles are not sold under the
Luminara mark," the Court finds this argument unpersuasive.  (Cf. Defs.' Mem. at 29
[Doc. No. 76].)  Luminara has presented evidence demonstrating that its candles are sold
on its website and through its customers with the "LUMINARA" mark.  (See Merrill
Decl., Ex. 38, Ex. 41 [Doc. No. 103-1]; Merrill Decl., Ex. 33 [Doc. No. 55-10].)

damages.  See also Automated Merch. Sys., Inc., 357 Fed. App'x at 301 (noting that a court may find irreparable harm sufficient to warrant a preliminary injunction if "failing to grant a preliminary injunction would permit [the defendant] to drop its prices in order to drive [the plaintiff] out of the market entirely").

Here, Luminara has presented weak or little evidence demonstrating that price erosion will likely occur in the future.  Plaintiff relies only on its President's contention that the company has received requests for price concessions due to the presence of Liown candles in the marketplace.  (See Cain Decl. ¶ 13 [Doc. No. 53].)  Although Mr. Cain claims that price erosion is a certainty, Plaintiff does not present evidence such as sales projections, market reports, or expert testimony to substantiate its claim of the likelihood of future price erosion.

While the likelihood of *future* price erosion is not strongly supported by evidence in the record, ███████████████████████████████████████████████████████████████████████████████████████████████████ In contrast to Luminara's prices, Liown's "Illuminaires" candles are being sold for $19.99 each at Boston Warehouse and Tuesday Morning.  (See Merrill Decl., Ex. 22, Ex. 33 [Doc. No. 55-9].)

Therefore, while Yang contends that Luminara was voluntarily cutting its prices,

(see Yang Decl. ¶ 7 [Doc. No. 80]), the Court finds that Luminara was likely cutting prices in order to compete with Liown's prices, because Luminara lowered its prices around the same time that it learned that GKI had purchased infringing candles from Liown.  (See Cain Decl. ¶ 6 [Doc. No. 53].); cf. Travel Tags, Inc. v. UV Color, Inc., 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (holding that irreparable harm because of price erosion did not exist because there was no indication that the parties had entered into a price war, or that the plaintiff's prior customer had considered only price when it decided to contract with the defendant, instead of the plaintiff).

In opposition, Defendants argue that "[p]rice erosion is not found with a mere citation to supposedly disparate prices for distinct products at hand-picked stores."  (See Defs.' Mem. at 30 [Doc. No. 76].)  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Therefore, Luminara has presented sufficient evidence demonstrating that price erosion has already occurred.

However, in order for price erosion to constitute irreparable harm, the harm must not be compensable by money damages.  The Federal Circuit explained in Polymer Technologies, Inc. that "[r]equiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option," and it "may be impossible to restore . . . an exclusive licensee's [] exclusive position by an award of damages."  See

103 F.3d at 975–76.  Here, Luminara is an exclusive licensee of Disney's Artificial

Flame Technology and argues that its "opportunity to charge higher prices while

Luminara candles are still relatively new and profit from its innovation will be

irretrievably lost if Liown continues to sell infringing flameless candles."  (See Pl.'s

Mem. at 33 [Doc. No. 52].)

As was the case in Polymer Technologies, Inc., it is unreasonable to assume that

Luminara would be able to require its customers to pay higher prices in the future, if

Liown is presently permitted to continue selling flameless candles to these customers at a

consistently low price.  Thus, the Court finds that Plaintiff has presented adequate

evidence demonstrating that existing price erosion serves as another basis for finding

irreparable harm.

### 4.  Loss of Sales and Customers to Direct Competitor

Finally, Plaintiff argues that without preliminary injunctive relief, it will suffer a

loss of customers and sales to its direct competitor, Liown.  (See Pl.'s Mem. at 30–31

[Doc. No. 52].)  As to lost sales, Luminara contends that but-for Liown's infringement

and tortious interference, GKI/Bethlehem and Light Garden would have purchased

Luminara candles instead of Liown candles.  (See id. at 30.)  Defendants contend that

Luminara "failed to allege any facts that would support such a speculative statement."

(See Defs.' Mem. at 28–29 [Doc. No. 76].)  The Court disagrees.  The contractual

agreements between Luminara and GKI/Bethlehem and Light Garden prohibited these

two Defendants from purchasing for resale any products incorporating the Artificial

Fame Technology, or products with confusingly similar technology, without Luminara's

pre-approval.  (See Cain Decl. ¶ 5 (citing GKI/Bethlehem Distribution Agreement § 2.04)

[Doc. No. 53]; Cain Decl., Ex. B "Light Garden Distribution Agreement" §§ 1.08, 2.01

[Doc. No. 53-1].)  Therefore, the Court agrees with Luminara that but-for Liown's

interference with these two contractual relationships, GKI/Bethlehem and Light Garden

would have been required to purchase flameless candles from Luminara instead.

However, "lost sales standing alone are insufficient to prove irreparable harm;

[because] if they were, irreparable harm would be found in every case." See Automated

Merch. Sys., Inc., 357 Fed. App'x at 300–01.  Here, Plaintiff alleges more than simply

lost sales to substantiate its contention of irreparable harm.  In addition to lost sales,

Luminara alleges lost market share, loss of goodwill, harm to reputation, and price

erosion.  Therefore, although lost sales evidence "by itself could not support a finding of

irreparable injury," id. at 301, here, Plaintiff alleges more than simply lost sales.

As to lost customers, Luminara argues that it suffers irreparable harm because "its

customers may not come back to Luminara even if Liown's infringing moving candles

are eventually taken off the market after a trial on the merits."  (See Pl.'s Mem. at 30

[Doc. No. 52].)  In Trebro Mfg., the Federal Circuit explained that loss of customers may

constitute irreparable harm, particularly when the customer loss could result in the

movant laying off its employees.  See Trebro Mfg., Inc., 748 F.3d at 1170–71.  Here,

however, Luminara did not present any evidence to substantiate its speculative claim of

customer loss.

Nonetheless, in sum, the Court finds that Luminara suffers a threat of irreparable

harm in the absence of relief because Luminara has established that it will suffer lost

sales, loss of goodwill, harm to its reputation, and it has already suffered from price erosion.  Therefore, the second <u>Dataphase</u> factor also weighs in favor of the Court granting the preliminary injunction.

### C.  Balance of Hardships

Next, the Court considers the third <u>Dataphase</u> factor, and compares the harm that will result to Luminara if relief is denied with the harm that will result to the other litigants if the relief is granted.  <u>See</u> <u>Dataphase Sys., Inc.</u>, 640 F.2d at 114.  The harm that Plaintiff will endure if a preliminary injunction is not granted is detailed in the Court's discussion of irreparable harm, above.  <u>See</u> <u>supra</u> Part III(B).  Plaintiff argues that while it will suffer irreparable harm without a preliminary injunction, "Liown and the other [D]efendants will suffer relatively little harm if an injunction were ordered."  (<u>See</u> Pl.'s Mem. at 34 [Doc. No. 52].)  Luminara contends that the harm to Liown would be minimal because the injunctive relief Luminara seeks is narrowly tailored.  (<u>See</u> <u>id.</u>) Specifically, Luminara explains that it only seeks an injunction "barring Liown's sales to [Luminara's] customers, such as GKI/Bethlehem, Light Garden, and other existing Luminara customers."  (<u>See</u> <u>id.</u>)  Plaintiff additionally argues that given the limited nature of the injunction sought, Liown would only lose revenue that was "generated from [the alleged] infringement of Luminara's patents or . . . [from the alleged] breach of customers' contracts."  (<u>See</u> <u>id.</u> at 35.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ because these customers would likely "suffer from decreased sales and revenue"

and would "likely be forced to sell an [allegedly] inferior product such as Luminara's."

(See Defs.' Mem. at 32 [Doc. No. 76].)

> In Illinois Tool Works, Inc. v. Grip-Pak, Inc., the Federal Circuit explained that:
>
> The hardship on a preliminarily enjoined manufacturer who must withdraw
> its product from the market before trial can be devastating.  On the other
> hand, the hardship on a patentee denied an injunction after showing a
> strong likelihood of success on validity and infringement consists in a
> frequently and equally serious delay in the exercise of his limited-in-time
> property right to exclude.  Neither hardship can be controlling in all cases.
> Because the court must balance the hardships, at least in part in light of its
> estimate of what is likely to happen at trial, it must consider the movant's
> showing of likelihood of success.  Yet, a court must remain free to deny a
> preliminary injunction, whatever be the showing of likelihood of success,
> when equity in the light of all the factors so requires.

See 906 F.2d 679, 683 (Fed. Cir. 1990) (citing Roper Corp. v. Litton Sys., Inc., 757 F.2d

1266, 1272–73 (Fed. Cir. 1985)).  Accordingly, in Illinois Tool Works, Inc., the Federal

Circuit held that the plaintiff's "weak showing of likelihood of success tip[ped] the

balance of hardships toward [the defendant]."  See id.

Applying a similar analysis, in Intel Corp. v. ULSI System Technology, Inc., the

Federal Circuit held that the plaintiff had failed to show a likelihood of success on the

merits and the balance of hardships tipped in the defendant's favor because the

defendant's product, which allegedly infringed the plaintiff's patent, was the defendant's

"only product" so the defendant "would in all likelihood be forced out of business if it

were enjoined."  See 995 F.2d 1566, 1568 & 1571 (Fed. Cir. 1993) (internal quotations omitted).

Here, unlike the plaintiffs in Illinois Tool Works, Inc. and Intel Corp., Luminara has established a substantial likelihood of success on the merits.  Also, unlike the defendant in Intel Corp., Liown stated in its response brief that its flameless moving candle is not its only product.  (See Defs.' Mem. at 29 [Doc. No. 76].)  Nonetheless, the harms to Liown may be substantial if injunctive relief is granted.  ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████  ■  Moreover, unlike defendants in other patent infringement cases that did not seek a patent first, here, the USPTO granted Liown a patent for a flameless moving candle.  Cf. Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006) (holding that the district court had not erred in finding that the balance of hardships tipped in the plaintiff's favor, because the defendant's harms were "'almost entirely preventable' and were the result of its own calculated risk to launch its product pre-judgment."); EZ Gard Indus., Inc., 2008 WL 1827490, at *5

---

[13]    Plaintiff contends that Liown's ████████████ annual sales loss estimate "presumes an injunction against *all* Liown sales, rather than the limited injunction against sales to Luminara customers."  (See Pl.'s Reply at 13 (emphasis original) [Doc. No. 101].)  However, Luminara offers no substantive evidence to support this claim, and Yang's declaration does not indicate that his estimate is based on an injunction against all Liown sales.  (See Yang Decl. ¶ 3 [Doc. No. 80].)

(explaining that the balance of hardships tipped in favor of the plaintiff seeking a preliminary injunction because the defendant did not have a patent for its product and acted as though it knew its product infringed the plaintiff's patent because once the defendant was notified by the plaintiff of a possible infringement, the defendant withdrew its original product and substituted a second product).

As the harms to Luminara would likely be substantial and irreparable if a preliminary injunction was denied (see supra Part III(B)), and the harms to Liown would similarly be substantial and irreparable if a preliminary injunction was granted, the Court finds that the balance of hardships analysis favors neither party.

### D. Public Interest

Finally, the Court considers the fourth Dataphase factor and determines whether the public interest weighs in favor of granting or denying a preliminary injunction. See Watkins Inc., 346 F.3d at 844 (citing Dataphase Sys., Inc., 640 F.2d at 114). The Federal Circuit explained in Hybritech Inc. v. Abbott Laboratories that "[t]ypically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." See 849 F.2d 1446, 1458 (Fed. Cir. 1988). In regards to the public's interest in protecting a movant's patent rights, "'the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to the invention itself and the very lifeblood of a competitive economy.'" See Figueroa v. United States, 466 F.3d 1023,

1034 n.16 (Fed. Cir. 2006) (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489

U.S. 141, 146 (1989)).

Plaintiff contends that unlike other cases that involve "life-saving drugs, disease

testing kits, or other products designed to promote the public's health, safety and

wellbeing," this case does not involve a critical public interest that would be injured by

the grant of preliminary relief.  (See Pl.'s Mem. at 35 [Doc. No. 52].)  Rather, Luminara

claims that the public interest weighs in favor of protecting its valid patent.  (See id.).

Defendants disagree.  Liown claims that public policy strongly favors free

competition.  (See Defs.' Mem. at 32 [Doc. No. 76].)  In support of this argument, Liown

cites Lear, Inc. v. Adkins, 395 U.S. 653, 656 (1969).  (See id.)  However, Liown

mischaracterizes the holding in Lear.  In Lear, the Supreme Court of the United States

held that the plaintiff was not estopped from attacking the validity of the patent-at-issue

and could avoid payment of all royalties accruing after the patent was granted if the

plaintiff could prove patent invalidity.  See Lear, 395 U.S. at 674.  The Lear Court

explained that if the patent was actually invalid, then enforcing a contractual provision, in

which the plaintiff promised to pay royalties to the defendant at the very outset of their

relationship, would "undermine the strong federal policy favoring the full and free use of

ideas in the public domain."  See id.  Thus, Lear does not stand for the principle that the

public policy favoring free competition outweighs the public policy favoring patent

enforcement.  (Cf. Defs.' Mem. at 32–33 [Doc. No. 76].)  Rather, Lear clarifies that

public policy favoring free competition is given the most weight when a patent is likely

invalid.  In instances of patent invalidity, "the equities of the licensor do not weigh

heavily when they are balanced against the important public interest in permitting full

and free competition in the use of ideas which are in reality a part of the public domain."

See Lear, 395 U.S. at 670.

Here, because proof of validity and infringement are strong, the public interest is

served by a preliminary injunction that protects a patent owner's property rights, and the

public's interest in permitting full and free competition is not squarely at stake. Cf. Pass

& Seymour, Inc. v. Hubbell Inc., 532 F. Supp. 2d 418, 434–35 (N.D.N.Y. 2007) (denying

the plaintiff's motion for a preliminary injunction because "there exist[ed] serious

questions regarding the invalidity of the [] patent claims in issue in this case, and [the]

plaintiff ha[d] presented insufficient evidence of irreparable harm," and explaining that

"the public's interest [was] not in the end best served by removing what may well be a

non-infringing product from the market") (internal quotations and citations omitted);

Yamashita v. Wilbur-Ellis Co., No. C 06-01690 (WHA), 2006 WL 1320470, at *5, *8

(N.D. Cal. May 15, 2006) (explaining that the patents-in-suit were "vulnerable" to a

challenge on invalidity grounds, and finding that the public interest weighed in favor of

denying the preliminary injunction because it was in the customers' interest to have

access to competitive products).  Moreover, entry of a preliminary injunction may serve

the public interest in this case because it would enforce Luminara's valid trademark and

could prevent consumer confusion in the marketplace between the "LUMINARA" brand

and the "Illuminaires" brand.  See Mohan, 2010 WL 5095676, at *25 (explaining that

"[o]nce a likelihood of confusion is shown, the public interest is damaged if such

confusion is allowed to continue.")

While Defendants correctly note that the public also has a paramount interest in seeing that patent monopolies are kept within their legitimate scope, (see Defs.' Mem. at 33 (citing Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843, 851 (2014)) [Doc. No. 76]), Plaintiff does not appear to be litigating outside the scope of Disney's Artificial Flame Technology patents. Accordingly, based on the evidence in the record, the Court finds that the public interest weighs in favor of granting the preliminary injunction motion.

## E. Contours of Preliminary Injunction

Here, the totality of factors weighs in favor of granting Plaintiff's preliminary injunction. Recently, in CyroLife, Inc. v. C.R. Bard, Inc., a district court in Delaware granted a motion for a preliminary injunction based on the fact that the totality of the Dataphase factors weighed in favor of the movant. See CyroLife, Inc. v. C.R. Bard, Inc., No. CV 14-559-SLR, 2015 WL 1093543, at *3 (D. Del. Mar. 10, 2015), appeal docketed, No. 15-1517 (3d Cir. Apr. 3, 2015). In CyroLife, Inc., the court explained that the movant demonstrated a likelihood of success on the merits in regards to the validity of its own patent and the likelihood that its competitor infringed the movant's patent. See id. The movant also made "persuasive arguments for the loss of its customer base and damage to its goodwill," and for those reasons, the court held that the "balance of the hardships and the public interest weigh[ed] in [the movant's] favor." See id.

In this case, Luminara similarly established a substantial likelihood of success on the merits of its patent infringement claim, and Liown failed to raise substantial doubt about the validity of the '166 patent. Luminara also established likelihood of irreparable

harm and made persuasive arguments about the loss of its customer base and damage to its goodwill if a preliminary injunction is denied.  The final <u>Dataphase</u> factor also favored granting a preliminary injunction because of the public's interest in enforcing valid patents.  While the balance of hardships analysis favored neither party, in totality, the <u>Dataphase</u> factors weighed in favor of granting Plaintiff's Motion.  <u>See</u> <u>Scholle Corp. v. Rapak LLC</u>, 35 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014) (granting plaintiff's motion for preliminary injunction on patent infringement claim because plaintiff demonstrated likelihood of success on the merits and likelihood of irreparable harm without the injunction, and the "balance of equities tip[ped] slightly in [the plaintiff's] favor"); <u>Won-Door Corp. v. Cornell Iron Works, Inc.</u>, 981 F. Supp. 2d 1070, 1079 (D. Utah 2013) (same).  Therefore, "Defendants, any of their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation," are hereby enjoined from "manufacturing, distributing, selling or offering for sale" moving flameless candles to Luminara's customers.  (<u>See</u> Pl.'s Mem. at 13 [Doc. No. 52].)

As to Luminara's request that Defendants recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers, the Court also grants Plaintiff's request.  Federal district courts have general equitable power to fashion relief.  <u>See</u> <u>Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 342 (1999) (Ginsburg, J.) (concurring-in-part, dissenting-in-part) (explaining that federal courts must rely on their 'flexible jurisdiction in equity . . . to protect all rights and do justice to all concerned,'") (quoting <u>Rubber Co. v. Goodyear</u>, 9 Wall. 805, 807 (1869)); <u>Carter v. Gallagher</u>, 452 F.3d 315, 324 (8th Cir. 1971) (explaining that courts of

equity have broad power to fashion an effective remedy).

In fact, the patent statute specifically provides that district courts have authority to grant injunctive relief "to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." See Reebok Int'l Ltd. v. Baker, Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994), abrogated on other grounds, eBay Inc., 547 U.S. 388, as recognized in Voile Mfg. Corp. v. Dandurand, 551 F. Supp. 2d 1301, 1305 (D. Utah 2008); see also Hybritech Inc., 849 F.2d at 1457.

Although the Court has not found authority from the Eighth Circuit asserting the legal standard required for ordering a defendant to recall a product,[14] the Court finds that in order to preserve Plaintiff's legal interests and protect Plaintiff's patent rights, it is necessary for Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers.  (See Pl.'s Mem. at 13 [Doc. No. 52].)  Without this recall, the stores and distribution centers could continue selling and offering for sale moving flameless candles, which allegedly infringe the Artificial Flame Technology patents, if they have such candles in stock.  The sale of this allegedly infringing product to end consumers would continue to irreparably damage Luminara's and Disney's reputations.  Therefore, in order to curb the loss of goodwill and harm to

---

[14]    The Court was able to locate only one Eighth Circuit case mentioning product recall as part of a plaintiff's requested preliminary injunctive relief. See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 489 (8th Cir. 1993).  However, in Sanborn Mfg.Co., the Eighth Circuit did not announce a standard for determining whether recall was appropriate.  Rather, the Court simply stated that "[a]t the hearing on the preliminary injunction motion, [the plaintiff] withdrew its request for a product recall from consumers from the district court's consideration of its motion for preliminary injunction."  See id.  Therefore, the Court relies on its equitable powers when fashioning relief in this case.

reputation suffered by Luminara and Disney, the Court uses its equitable powers to order Defendants to recall any and all moving flameless candles currently in Luminara's customers' stores or distribution centers.

### F.  Luminara Must Post Bond

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." See Fed. R. Civ. P. 65(c). "This bond requirement is designed to protect the enjoined party's interests in the event that future proceedings show the injunction issued wrongfully." Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1339 (Fed. Cir. 2012) (O'Malley, J., concurring-in-part, dissenting-in-part) (citing Edgar v. MITE Corp., 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (explaining that "[s]ince a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully."); Piambino v. Bailey, 757 F.2d 1112, 1143 (11th Cir. 1985) (noting that "Rule 65(c)'s bond requirement . . . was intended by Congress to protect enjoined parties from the losses that result from improvidently granted injunctions")). "The requirement of a security bond imposed by [Rule] 65(c) is left to the sound discretion of the district judge." Northwestern Bell Tel. Co. Bedco of Minnesota, Inc., 501 F. Supp. 299, 304 (D. Minn. 1980). In fact, "this Court has found no authority

from the Federal Circuit governing the parameters for the amount of the bond—and the parties have supplied none."  See Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006) aff'd, 470 F.3d 1368 (Fed. Cir. 2006).

Plaintiff seeks either no bond, or a bond of only $10,000, because it contends that "granting a preliminary injunction will not cause any harm to Liown."  (See Pl.'s Mem. at 36–37 [Doc. No. 52].)  Defendants argue that because Liown stands to lose ███████ ██████ due to interference with its sales and customer relationships, bond should be set at no less than $2 million.  (See Defs.' Mem. at 34 [Doc. No. 76].)

The Court agrees with Defendants, insofar as Liown states that it risks suffering substantial harm if the Court wrongfully grants Plaintiff's motion.  However, while Liown CEO John Yang claims that Liown may lose ███████████████████ ████████████████████████████████████ (See Yang Decl. ¶ 3 [Doc. No. 80].)  Defendants fail to supplement the record with any expert testimony, sales data, or market reports.  Although the precise value of lost sales is unsupported in the record, the Court is persuaded that Liown will unquestionably suffer a significant amount of lost sales because of this preliminary injunction.

When courts in this District are presented with little or no substantive evidence to support a specific bond value, they have ordered bond payments ranging from $5,000 to $1 million.  See, e.g., Novus Franchising, Inc. v. Dean, No. 10-cv-2834 (JRT/SER), 2011 WL 1261626, *5 (D. Minn. Mar. 30, 2011) (ordering the plaintiff to post a bond in the sum of $5,000, but not explaining any basis for the bond value); Coca-Cola Co. v. Purdy, No. 02-cv-1782 (ADM/AJB), 2002 WL 31010285, *3 (D. Minn. Sept. 5, 2002) aff'd, 382

F.3d 774 (8th Cir. 2004) (same); United HealthCare Ins. Co. v. Advance PCS, No. 01-cv-

2320 (RHK/JMM), 2002 WL 432068, *18 (D. Minn. Mar. 18, 2002) aff'd, 316 F.3d 737

(8th Cir. 2002) (explaining that while the defendant argues for a $54 million bond, "there

[was] no basis for concluding that [the defendant] could have damages approaching such

a high figure if it were later to appear that the injunction was erroneously entered," and

instead ordering the plaintiffs to post a bond in the sum of $1 million); Gravity Guidance,

Inc. v. Weseman, No. 4-82-1667, 1983 WL 51939, *4 & n.3 (D. Minn. Oct. 17, 1983)

(finding that a bond in the amount of $30,000 was appropriate, because although the

defendants' counsel initially requested a bond in the amount of $25,000, and later

increased his request to $200,000, "[i]t was not clear how he arrived at these figures or

the basis for the discrepancy [between the two values]").  Because Liown will

unquestionably suffer lost sales as a result of this preliminary injunction, but Defendants

failed to present substantive evidence substantiating their anticipated losses, the Court

finds that a bond in the value of $100,000 is reasonable.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Plaintiff's Motion for Preliminary Injunction [Doc. No. 50] is **GRANTED**:
    a. Defendants are enjoined from manufacturing, distributing, offering for sale, selling, or importing moving flameless candles to Plaintiff's customers.
    b. Defendants must recall any and all moving flameless candles currently in Plaintiff's customers' stores or distribution centers.

2. In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiff shall post a bond with the Clerk of the Court in the amount of $100,000 for the payment of such costs and damages as may be incurred or suffered by Defendants

in the event Defendants are found to have been wrongfully enjoined or restrained.

3. This Order shall go into effect upon the posting of the bond, and shall remain in effect until further order of this Court dissolving this Preliminary Injunction.

4. The parties are ordered to show cause ten days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.


Dated:  April 20, 2015                          s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge